UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BALLON STOLL, P.C.,

Plaintiff,

– *against* –

AVRAHAM "AVI" Z. CUTLER; CUTLER, GORDON AND WARGA, PLLC; JOHN DOES 1–10; *and* JANE DOES 1–10,

Defendants.

AVRAHAM "AVI" Z. CUTLER,

Counterclaim- and Third-Party Plaintiff,

– *against* –

BALLON STOLL, P.C. *and* VANO HAROUTUNIAN,

Counterclaim-Defendant and Third-Party Defendant.

**OPINION & ORDER**

23 Civ. 366 (ER)

RAMOS, D.J.:

Ballon Stoll P.C., a New York law firm, filed this suit against Avraham Z. Cutler; his law firm, Cutler, Gordon and Warga Law PLLC[1] ("CGW"); and John and Jane Does 1–10. Ballon Stoll alleges that Cutler—who became a shareholder at Ballon Stoll in April 2021 and left the firm to lead CGW in December 2022—withheld information from his fellow shareholders at Ballon Stoll, impeded the firm's efforts to bill and collect from clients, and misappropriated firm revenues. In response, Cutler filed several claims against Ballon Stoll and one of its shareholders, Vano Haroutunian, in which he alleged

[1] Although the operative complaint names "Cutler, Gordon and Warga, PLLC" as a defendant, counsel for that entity notes that the firm is in fact named "CGW Law PLLC." Doc. 106-2 at 5.

that Ballon Stoll had wrongfully denied him compensation and that Haroutunian had misappropriated firm revenues.

Before the Court is Cutler's motion to withdraw certain of his admissions pursuant to Federal Rule of Civil Procedure 36(b), as well as the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Cutler's motion to withdraw his admissions is DENIED, Cutler and CGW's motion for summary judgment is DENIED, and Ballon Stoll and Haroutunian's motion for summary judgment is GRANTED in part and DENIED in part.

## I. BACKGROUND

The following facts are drawn from the parties' Rule 56.1 statements and the supporting documents.[2] They are undisputed unless otherwise noted.

### A. Ballon Stoll's Claims Against Cutler & CGW

Ballon Stoll Bader & Nadler, P.C. ("BSBN") was a law firm that was formed in 1992. Doc. 106-1 ¶ 1.[3] BSBN hired Cutler as an intern in June 2006. *Id.* ¶ 2.

---

[2] To assist the Court in its determination as to whether there exist any genuine issues of material fact, Local Rule 56.1 requires a party moving for summary judgment to submit a statement of the material facts that it contends are not genuinely in dispute, Loc. Civ. R. 56.1(a), and requires the opposing party to submit a statement specifically responding to the assertion of each purported undisputed fact by the movant, Loc. Civ. R. 56.1(b). *See Monahan v. New York City Department of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) (noting that Local Rule 56.1 is designed to place the responsibility on the parties to identify the material facts in dispute, thereby "clarify[ing] the elements of the substantive law" at issue, and that "[w]hile the trial court has discretion to conduct an assiduous review of the record . . . it is not required to consider what the parties fail to point out" (internal quotations omitted)). Each of the parties' respective statements of material fact must be supported by a citation to admissible evidence in the record. Loc. Civ. R. 56.1(d); *see also* Fed. R. Civ. P. 56(c)(1)(A) (requiring reliance on admissible evidence in the record in supporting or controverting a purported material fact). Statements of material fact set forth by the moving party will be deemed admitted for purposes of the motion "unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Loc. Civ. R. 56.1(c). But "[w]here . . . the record does not support the assertions in a Local Rule 56.1 statement, those assertions [will] be disregarded and the record reviewed independently." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001). In those instances, the Court will refer to the cited portions of the record rather than Local Rule 56.1 statement. Finally, where a denial is not supported by admissible evidence in the record, the denial will be treated as an admission so long as the underlying statement of material fact is properly supported by the record. *Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 335 n.5 (E.D.N.Y. 2023) (collecting cases).

[3] Although Doc. 106-1 includes both Cutler and CGW's responses to Ballon Stoll and Haroutunian's Rule 56.1 statement and Cutler and CGW's counterstatement of material facts, for simplicity, when the Court cites to paragraphs in Doc. 106-1, it is referring solely to the former.

Haroutunian became a shareholder of BSBN in October 2006.[4] *Id.* ¶ 3. Cutler continued to work for the firm after he graduated law school and was admitted to practice in New York in 2008. *Id.* at ¶ 2.

In years following BSBN's formation, three of its four named shareholders passed away. Doc. 106-1 ¶ 4. Thus, by July 2020, only one of BSBN's named shareholders, Howard Bader, remained at the firm, *id.* ¶ 5, along with three other shareholders: Haroutunian, Michael J. Sheppeard, and Marshall Bellovin, Doc. 114-1 ¶ 2. Approximately one month later, Bader and Sheppeard left the firm. *Id.* ¶ 3; Doc. 106-16 at 13–14.[5] According to Haroutunian's deposition testimony, Bader and Sheppeard were "paid out in connection with their" departure. Doc. 106-16 at 13–14. A few months later, in October 2020, Haroutunian sent an email to the firm that announced the creation of a new management team, in which he would serve as managing partner and chief financial officer and Bellovin would serve as chief operating officer. Doc. 114-1 ¶ 4; Doc. 114-17 at 2–3.

Throughout the end of 2020 and into early 2021, Cutler and Haroutunian discussed the possibility of Cutler becoming a shareholder of the firm. Doc. 114-1 ¶ 5; Doc. 114-7 ¶ 5. Cutler contends that, during these conversations, Haroutunian specifically asked him to become a shareholder. Doc. 114-1 ¶ 5; Doc. 106-4 ¶ 8. Haroutunian denies that he asked Cutler to become a shareholder but concedes that he discussed this possibility with Cutler. Doc. 114-7 ¶ 5. In any event, Cutler and Haroutunian agree that they met in Las Vegas sometime during this period to discuss

[4] While Cutler and CGW "[d]eny knowledge and information sufficient to respond" to this and other factual assertions in Ballon Stoll and Haroutunian's Rule 56.1 statement, *see, e.g.*, Doc. 106-1 at 2 ¶ 3, "[a] properly asserted fact is not considered disputed if a party states that it does not have knowledge sufficient to respond to the opposing party's asserted statement of material fact." *Lichtman v. Chase Bank USA, N.A.*, No. 18-CV-10960, 2020 WL 1989486, at *1 n.1 (S.D.N.Y. Apr. 27, 2020). Therefore, the Court deems these facts admitted.

[5] For any filings that do not include paragraph numbers, citations refer to the page numbers produced by ECF.

Cutler becoming a shareholder.[6] Doc. 114-1 ¶ 6. Cutler and Haroutunian agree that, during this meeting, Haroutunian informed Cutler that a new shareholder agreement would be drafted and executed. *Id.* ¶ 7. Cutler and Haroutunian dispute, however, whether Haroutunian made any additional representations during this meeting. Cutler asserts that Haroutunian also promised him that, as a shareholder, Cutler would be regularly provided with all the firm's financial information, and that, if he ever left the firm, he would be entitled to be paid out for the redemption of his shares "just like the shareholders who had left BSBN several months prior." *Id.*; Doc. 106-4 ¶ 10. Cutler contends that he agreed to become a shareholder based on these representations. Doc. 114-1 ¶ 8; Doc. 106-4 ¶ 11. Haroutunian not only denies making these promises but further contends that these issues were never discussed. Doc. 114-7 ¶ 7.

In April 2021, BSBN filed a "Restated Certificate of Incorporation," pursuant to which the firm was renamed "Ballon Stoll P.C." Doc. 114-1 ¶ 10. The certificate of incorporation listed four shareholders: Cutler, Haroutunian, Bellovin, and Mark Stillman. *Id.* From April 2021 through December 2022, Haroutunian served as majority shareholder, officer, and managing partner of Ballon Stoll. Doc. 114-1 ¶ 15. Although, when Cutler first became a shareholder, he held a 15% interest in the firm,[7] Doc. 106-1 ¶ 8, by December 2021, his ownership interest had increased to 30%, Doc. 114-1 ¶ 11. Cutler was not asked by any shareholder or representative of BSBN or Ballon Stoll to make a cash contribution when he became a shareholder of Ballon Stoll, *id.* ¶ 9; nor did he pay any money for his shareholder interest, Doc. 106-1 ¶ 9.

According to Haroutunian, Bellovin, and Stillman, Cutler's responsibilities and obligations as a shareholder included: accurately documenting and maintaining a record

---

[6] Cutler contends this meeting took place on April 23, 2021. Doc. 114-1 ¶ 6. Haroutunian does not recall the exact date of the meeting. *Id.*; Doc. 114-7 ¶ 6.

[7] Although the parties agree that Cutler became a 15% shareholder in April 2021, it is not clear from the record how or precisely when that 15% figure was agreed upon. The Restated Certification of Incorporation does not attribute a specific percentage of the shares to any shareholder. Doc. 106-5 at 4.

of the hours and details of the client-related work he performed daily; maintaining a time-record of his work in one-tenth of an hour increments; ensuring the accurate and timely reporting of work being performed by the associate attorneys that worked on matters that he managed; accurately reporting to Ballon Stoll on a daily, weekly, or monthly basis the hours and details of the client-related work he performed; and invoicing and collecting for Ballon Stoll expenses and fees for the services that he or other Ballon Stoll staff performed for clients that he managed. *Id.* ¶¶ 11–15. Cutler does not specifically dispute that these activities constituted part of his responsibilities; rather, he maintains that from 2021 to 2022, he was not subject to any *formal* obligations regarding these activities insofar as Ballon Stoll lacked a written shareholder policy or agreement regarding billing requirements, timekeeping increments, shareholders' responsibility for the accuracy and timeliness associates' timekeeping, deadlines for reporting client work, or invoicing and collection responsibilities. *Id.* (citing Doc. 106-4 ¶ 39). In fact, Cutler asserts that he, Haroutunian, Bellovin, and Stillman did not sign a written shareholder agreement "of any type" in 2021 or 2022. Doc. 106-4 ¶ 39.

Ballon Stoll and Haroutunian assert that, in March 2022, Cutler and an associate at the firm, Moshe Warga, began "holding back" a significant portion of their client-billable hours for substantially all the matters that Cutler managed, along with descriptions of this work. Doc. 98-1 ¶ 16. Ballon Stoll and Haroutunian maintain that this continued for months and prevented Ballon Stoll from billing these clients for this work or collecting for out-of-pocket expenses that Ballon Stoll had incurred on these matters. *Id.* ¶¶ 17–18.

Cutler denies that he intentionally failed to disclose his billable hours. Doc. 106-4 ¶ 51. He admits that, throughout most of 2021, he was generally one to two months behind in billing. *Id.* ¶ 38. He also notes that, as business increased, this "time lag slowly increased" and his "struggles" with billing worsened. *Id.* ¶¶ 38, 40. Cutler contends, however, that he made efforts to improve his billing practices. For example, he

asserts that he initiated conversations with the other shareholders about receiving assistance with his billing, and that, at some point in late 2021 or early 2022, the shareholders agreed to hire someone to assist Cutler with billing. Doc. 114-1 ¶ 69; Doc. 106-4 ¶ 40. Although Cutler and Haroutunian identified and interviewed a candidate for this position in June 2022, the candidate withdrew her application on July 11, 2022, citing a death in her family. Doc. 114-1 ¶¶ 70–71; Doc. 114-15 at 2. Cutler and Haroutunian then agreed to have an existing Ballon Stoll employee, Krista Mortland, devote part of her time to work on Cutler's billing in late July 2022. Doc. 114-1 ¶ 71.

Mortland started working on Cutler's billing on August 1, 2022.[8] *Id.* According to Mortland, her work was severely limited by Cutler's failure to provide her with complete access to information regarding his client-related work from March to December 2022. Doc. 114-2 ¶ 6. For example, Mortland asserts that Cutler did not provide her with "any sources of information or records that contained details or descriptions of [his] work/hours during those months" for large swaths of tasks, including "his review of documents or agreements, performance of legal research drafting and/or revising contracts or agreements, . . . drafting of trust agreements or trust instruments, or any other client-related work he may have performed such as client-related conferences or meetings." *Id.* ¶¶ 7–8. Mortland also contends that she was unable to assist with billing for Cutler's text or WhatsApp communications to clients because he did not provide her with access to his mobile phone. *Id.* ¶ 9.

Mortland contends that, rather than providing this information, Cutler provided her with access to his personal Gmail account, so that she could review and inventory any client-related emails in that account from March 2022 onward and summarize this

---

[8] While Mortland engaged in this work, she experienced various medical and personal issues: she began working from home after she was hospitalized due to a herniated disk on August 9, 2022; and after Mortland returned to the hospital for surgery on August 25, 2022, she was infected with Covid during her recovery. Doc. 114-1 ¶¶ 73–74. Her father was also admitted to the ICU in November 2022. *Id.* ¶ 75.

information in shared documents on the Google Docs platform. *Id.* ¶ 10. According to Mortland,

> [t]he intention was that once the email review and inventory for each month was completed by [her], and then reviewed and revised by Mr. Cutler relating to all email communications, Mr. Cutler would then add his hours and description of work he performed during that month relating to each client—such as drafting, reviewing, revising, research, meetings, conferences, etc., and his communications by text message and WhatsApp platform—so that all the time, together with [the] email communications that [she] was gathering, could be entered in Ballon Stoll's billing software.

*Id.* ¶ 11.

Meanwhile, in October 2022, Cutler began to discuss his potential departure from Ballon Stoll with Warga and another associate, Chaim Gordon. Doc. 106-1 ¶ 22; Doc. 106-4 ¶ 33. According to Gordon, Cutler called him, told him that he was having difficulties at Ballon Stoll, and informed him that he was considering starting a new firm, to which he believed that his Ballon Stoll clients would follow him. Doc. 98-16 at 4–10. Gordon also testified that Cutler offered to make him a partner at the new firm, that he accepted that offer, and the two of them also discussed Warga's joining the new firm. *Id.* Gordon continued his discussions with Cutler over their personal emails, in part because he did not want Ballon Stoll to find out about these communications. *Id.* at 12. While Cutler admits that he discussed the possibility of leaving Ballon Stoll and creating a new firm with Gordon and Warga in October and November 2022, he contends that, during these conversations, Gordon and Warga did not confirm that they would join him at the new firm "for certain."[9] Doc. 106-4 ¶ 33.

On November 8, 2022, Cutler sent an email to Haroutunian, Bellovin, and Stillman announcing that "the time ha[d] come for [him] to move on" from Ballon Stoll

---

[9] Cutler contends that Gordon and Warga did not confirm that they would join him at his new firm until "around the same time" that they informed Ballon Stoll's shareholders of their resignation on November 28, and November 29, 2022, respectively. Doc. 106-4 ¶ 33; Doc. 106-1 ¶¶ 29–30; Doc. 98-18 at 2.

and that he "therefore tender[ed] [his] resignation, with December 22nd being [his] last day." Doc. 98-7 at 2.

In the email, Cutler also stated that his "plan" was "to open [his] own law firm." *Id*. Ballon Stoll and Haroutunian argue that this statement was false because, when Cutler had sent his resignation email, he had moved beyond planning and had, in fact, already created his own law firm. Doc. 106-1 ¶ 21. In support of this contention, Ballon Stoll and Haroutunian note that Cutler had filed for and successfully incorporated CGW in Arizona on the same day that he sent the email. *Id.* ¶¶ 21, 24. They also highlight that the letters "CGW" stand for Cutler, Gordon, and Warga, which, in their view, shows that the three attorneys had agreed by November 8, 2022, to partner together and name the firm. *Id.* ¶ 25. Cutler does not dispute that he incorporated CGW on the same day and "at about the same time that [he] sent [the] email," or that he named CGW after himself, Gordon, and Warga. Doc. 106-4 ¶¶ 32, 33. But he contends that CGW "did not actually operate (i.e., perform any legal work for clients) until the very end of November 2022," when Gordon had left Ballon Stoll and started to work at CGW. *Id.* ¶ 32. And he argues that, when he incorporated CGW, he used Gordon and Warga's initials simply because he was "hopeful that they would end up joining" him. *Id.* ¶ 33. Cutler maintains, however, that he had not received a firm commitment from Gordon or Warga that they would join him at his new firm at that point. *Id.*

Cutler's resignation email also stated that, before his last day at Ballon Stoll, he "[p]lan[ned] to focus primarily on getting all billing caught up and sent out so that end of the year bills encompassing all activity prior to [his] departure w[ould] be sent before years end." Doc. 98-7 at 2; Doc. 106-1 ¶ 32. Ballon Stoll and Haroutunian contend that, contrary to this representation, Cutler did not send bills to all of his clients prior to his departure and continued his practice of intentionally withholding the hours and details of the client work that he had performed from April through December 2022. Doc. 106-1 ¶ 33.

When, on November 15, 2022, Haroutunian replied to Cutler's resignation email by requesting that he bill and collect on several matters, Cutler responded three days later by declaring, *inter alia*, that he was going to use $95,663 that he had received from two Ballon Stoll clients for work performed by the firm to partially "pay off" the compensation that he contended that he was owed by the firm. Doc. 98-9 at 3–9. In explaining this decision, Cutler stated:

> To be clear, I'm not running around asking clients to pay me instead of the firm, but under the circumstances, and the goal to ensure that I am able to walk out with neither me nor the firm owing any obligations to each other, I'm not fighting it either. I will account for every penny received and how it's being applied. If I owe the firm money, I'll send it ASAP, just as I'd assume the firm will do for me with the money that will be coming in from the final billing.

*Id.* at 5. When, in response, Haroutunian accused Cutler of thereby "admit[ting] . . . that [he] diverted the firm's funds to [himself]" and asked him to wire the funds to the firm by the next day, Cutler refused, explaining:

> As far as the demand, I do not agree. If you would like to fully work through how much I am owed and pay the full amount (the $180k or so plus the wages already in [the firm's billing software]) then I'd of course be happy to send the money to the firm. However, what you are asking me to do, leave the firm with the firm owing me in excess of a quarter million dollars in [the] hope that I will be paid that plus the very significant sum I will be owed for post leaving collectibles, is not something I am comfortable doing. While I have no doubt of your good faith, past history has shown that there is always some expense that comes ahead of my salary and there is no reason that this would be better once I leave Ballon Stoll.

*Id.* at 3–4.

In the intervening weeks, the shareholders apparently continued their discussions regarding Cutler's departure and this exchange. Seemingly in response to these conversations, Cutler texted Stillman on December 6, 2022, that he was "insulted by the fact that they"—presumably the other shareholders—"would make accusations they know are false" and that their "[m]aking up that [he's] been secretly committing fraud is

unforgivable."[10] Doc. 114-16 at 2. He then added, "Plus of course it means no more timesheets which will ultimately cost everyone a bunch of money." *Id.* When Stillman responded, "We need those timesheets!" Cutler replied, "According to [Haroutunian]'s email this morning apparently you don't. After all, if telling [Warga] to do his [timesheets] is proof of criminal intent, I can't imagine how bad doing my own is." *Id.* Cutler concedes that, in sending this message, he meant to communicate that "there would be no further cooperative completion and clean-up of the timesheet process going forward." Doc. 119-1 ¶ 41.

A few minutes later, Cutler revoked Mortland's access to his Gmail account and the Google document in which she was helping to record his September billing information. Doc. 106-11 at 20; Doc. 114-2 ¶¶ 26–27; Doc. 119-1 ¶ 40; Doc. 106-12 at 2–6. At the time, Mortland had only completed her review and inventory of Cutler's emails through September 6, 2022. Doc. 114-2 ¶ 27; Doc. 106-4 ¶ 49. When Mortland told Cutler that she no longer had access to his Gmail or the Google document, he told her to stop working on his billing because "things ha[d] deteriorated between [him] and the firm." Doc. 106-11 at 20.

Prior to that point, Cutler and Mortland had worked to compile Cutler's billing information for March through July 2022 in five separate Google documents, which were organized by month. Doc. 106-12 at 2–6; Doc. 119-4 at 1. Although Cutler created the September Google document, Mortland created the Google documents for March through July; thus, Mortland retained access to the March through July documents even after Cutler revoked her access to the September Google document. Doc. 106-12 at 2–6; Doc. 119-4 at 1. Cutler does not dispute, however, that the March through July documents did not reflect the full extent of his client-related work at the firm. *See* Doc. 119-1 ¶¶ 33, 38–42. For example, there are numerous instances in the March through July documents in

[10] The parties do not identify what communications precipitated these statements.

which Cutler failed to estimate the amount of time that he spent on specific client-related tasks. Doc. 114-2 ¶ 25; Doc. 106-13. Cutler also admits that these documents lacked details of his client-related work in any month after July. Doc. 114-2 ¶¶ 29–31; Doc. 119-1 ¶¶ 38–41; Doc. 106-12 at 6.

Cutler ultimately resigned from the firm on December 22, 2022; he has not performed any work for the firm since then. Doc. 106-1 ¶ 40; Doc. 106-4 ¶ 36. Haroutunian contends that, in the months that followed, notwithstanding the firm's efforts to secure Cutler's cooperation, Cutler refused to disclose the hours and details of services he performed for the firm and instead made it clear that he intended to collect money from clients for himself. Doc. 106-1 ¶¶ 36–37. In support of this contention, he notes that, on January 12, 2023, Cutler sent several text messages to Stillman in which he announced his intent to "go[] back to [his] original plan," meaning that he would "send some bills," "take what [he's] owed[,] and then . . . send them any excess [he] collect[ed]." Doc. 98-5 at 2. When, after some back and forth, Stillman noted that Cutler "owe[d] the firm a lot of money," Cutler responded:

> No I don't owe the firm any money. The firm has the right to collect on my receivables which is not the same thing. But if they want to do that, practically it'll need my cooperation and they won't have that if I am not paid what I am owed. And of course if they go that route I have no problem collecting the amount I am owed, applying it against what I'm owed and then the firm can feel free to go out and do it's [sic] best to collect the rest.

*Id*.

Ultimately, Cutler failed to provide Ballon Stoll with his estimate of the amount owed for his client-related work from April through December 2022, or the information supporting that estimate, until he responded to its discovery demands in February 2025. Doc. 106-1 ¶ 39; Doc. 98-10 ¶¶ 14–15. Cutler does not dispute that he withheld this

information from Ballon Stoll until that point[11]; rather, he contends that he "tried to work out a deal to work together on the billing" with Ballon Stoll during the pendency of this litigation, "but Ballon Stoll refused to do so unless [he] agreed to let them hold the money collected and gave them the money being held in a separate account pending the results of this litigation, rather than having the collected funds held in a third-party escrow account." Doc. 106-4 ¶ 53. He also asserts that, sometime after he left Ballon Stoll, he "was able to work together with Ballon Stoll to generate invoices and collect on four bills (from four different clients) totaling $90,962.29 which are being held in their own interest-bearing account pending the results of this litigation." *Id.* ¶ 52.

### B. Cutler's Claims Against Ballon Stoll & Haroutunian

#### *1. Cutler's Compensation*

Cutler claims that Ballon Stoll has improperly denied him compensation that is due to him. Doc. 51 at 18–19. Cutler's compensation as a shareholder was set by agreement.[12] Doc. 106-1 ¶ 10; Doc. 98-6 ¶ 14. Although the parties do not identify when or how this agreement was consummated, they do not dispute that, pursuant to an agreement or series of agreements, Cutler was entitled to: (1) at least $75 for each hour that he worked; (2) 26% of all revenue from clients that he brought to Ballon Stoll; and (3) 30% of all firm profits. Doc. 114-1 ¶ 12. Cutler also argues, however, that he was entitled to an additional $37.50 per hour for any hours that he worked that exceeded forty hours a week. *Id.* Ballon Stoll and Haroutunian, by contrast, deny that Cutler was entitled to this overtime rate. *Id.*; Doc. 106-4 ¶ 64; Doc. 98-6 ¶ 14.

---

[11] Indeed, Cutler concedes that the March through July Google documents—which were the only pre-production documents that Ballon Stoll had access to regarding his post-March client-related hours—contained billing information that was incomplete. *See* Doc. 119-1 ¶¶ 31–42. And although Cutler denies this assertion in his Rule 56.1 counterstatement, he does not cite to any admissible evidence that contradicts it. *See* Doc. 106-1 ¶ 39. The Court therefore treats this response as an admission.

[12] Cutler asserts that he entered this agreement with his fellow shareholders. Doc. 106-4 ¶ 15. Ballon Stoll and Haroutunian concede that Cutler's compensation was governed by "agreement," but do not specify with whom this agreement or set of agreements was entered. Doc. 106-1 ¶ 10; Doc. 98-6 ¶ 14.

*2. Haroutunian's Handling of the Immigration Revenues*

Cutler also alleges that Haroutunian misrepresented the firm's finances and diverted immigration revenues for his personal use. Doc. 51 at 19–22. With the onset of the COVID-19 pandemic in 2020, BSBN started accepting payments from immigration clients via Zelle.[13] Doc. 114-1 ¶ 18. Haroutunian testified that the firm turned to Zelle because of difficulties that the pandemic posed to accessing the firm's office and bank, and the fact that "a lot of the business during that time was being done online with clients basically all over the world." Doc. 106-16 at 40.

Haroutunian also testified that, when the firm started accepting Zelle payments, it was unable to receive these payments directly into its operating account at Chase bank, because, according to Chase, Zelle was not available for business accounts.[14] Doc. 106-16 at 28; Doc. 116-17 at 12–13. Thus, Haroutunian set up the Zelle payments to be routed to his primary personal bank account, which he also used to receive personal funds and pay his personal expenses. Doc. 114-1 ¶¶ 22–23; Doc. 106-16 at 32, 41. The account number for this account ended in 7390. Doc. 114-1 ¶ 23.

Although Ballon Stoll's shareholders never entered into a written agreement regarding the immigration revenues that were deposited into Haroutunian's personal account, *id.* ¶ 65, Haroutunian contends that all the shareholders, including Cutler, approved of clients sending fees to his personal account through Zelle, Doc. 114-7 ¶ 13. He also testified that he saw no need to create a separate personal account for the firm's Zelle payments because any firm revenue that was paid through Zelle was "easily

---

[13] Ballon Stoll also received payments from its immigration clients via cash and credit card transactions. Doc. 114-1 ¶ 18.

[14] Cutler asserts that, regardless of what Chase representatives may have informed Haroutunian, Chase did, in fact, begin accepting Zelle payments for business accounts in 2020. Doc. 119-1 ¶ 21 (citing Doc. 119-3). The Court notes, however, that even if Chase offered this service to its commercial clients sometime in 2020, that does not necessarily establish that this feature was available to Ballon Stoll when it began accepting Zelle payments earlier that year.

identifiable" insofar as his bank statements contained the date of the deposits, the name of the sender, and the amount received for each sender. *Id.*; Doc. 106-16 at 41; Doc. 107-1.

Although the other shareholders were not named on the account and thus did not have access to it, Haroutunian shared copies of the account statements with the other shareholders; he also provided reports to the shareholders regarding the amount of money that was being sent to the account. Doc. 114-1 ¶ 52; Doc. 106-16 at 32. For example, during a December 2021 shareholder meeting, Haroutunian "advised" the other shareholders "that distributions to the Shareholders . . . would be . . . calculated primarily based on legal fees generated by the Corporation's immigration practice, *which fees generally were not deposited into the Corporation's operating account because the clients paid Mr. Haroutunian directly in monthly installments*." Doc. 106-6 at 2 (emphasis added). Minutes from that meeting also indicate that "Haroutunian previously had sent to Mr. Stillman a list of all fees and other compensation received by Mr. Haroutunian during calendar year 2021 year-to date (i.e., as of December 8, 2021) that were not deposited into the Corporation's operating account, the aggregate amount of which was approximately $1,635,000." *Id.* There is no indication from the meeting minutes that Cutler objected to this update or practice. *Id.* Haroutunian also testified that he periodically shared information about the immigration revenues that flowed to his personal account with the firm's bookkeepers, through spreadsheets that he would download from the bank in which he would identify the firm revenues. Doc. 106-16 at 36–38.

After Haroutunian discovered an unauthorized attempt to withdraw funds from the account ending in 7390, Chase closed the account in October 2021 and transferred the funds to another personal account that Haroutunian had with Chase. Doc. 114-1 ¶¶ 25–27; Doc. 106-17 at 10–11. The last four digits of the new account ended in 2077. Doc. 114-1 ¶ 26; Doc. 106-17 at 11–13. Haroutunian testified that, around that same time, he also attempted to route future Zelle payments to Ballon Stoll's bank accounts, but that his

efforts were unsuccessful because, according to Chase, Zelle was not yet available for commercial accounts. Doc. 106-17 at 13. Haroutunian contends that, at Chase's recommendation, he therefore arranged for any subsequent Zelle payments to be redirected to the 2077 account. Doc. 114-1 ¶ 26; Doc. 106-17 at 12–13; Doc. 114-7 ¶ 14. As with the 7390 account, Haroutunian would use the 2077 account for personal transactions, including receiving personal funds and making personal expenditures. Doc. 114-1 ¶¶ 28, 59, 60; Doc. 106-16 at 34. He also occasionally used the funds from the 2077 account to pay firm expenses, such as marketing costs or payroll for the subset of Ballon Stoll employees that were paid via Zelle. Doc. 106-16 at 34–35, 44–45.

Haroutunian also testified that, "from time-to-time," he received payments from clients on his personal PayPal and Venmo accounts, usually from clients who lack an American bank account. *Id.* at 58. Haroutunian further testified that, because these payments are "very infrequent"—he estimated that he has only ever received "a handful of payments" on these platforms in a given year—he decided that it was easier to route these payments to his existing PayPal and Venmo accounts than to create new accounts for Ballon Stoll. *Id.* at 58–59. According to Haroutunian, he would then periodically transfer the money from these accounts to the 2077 account that received clients' Zelle payments. *Id.* at 59.

At times, Haroutunian also transferred funds from the 2077 account to a separate personal account ending in 1871. Doc. 114-1 ¶¶ 29–30; Doc. 106-17 at 38, 41–42, 55–56. Haroutunian testified that he created the 1871 account as a replacement account for the 7390 account, and that the 1871 account served the same function as the 7390 account, except that it did not receive Zelle payments from immigration clients. Doc. 106-17 at 23. There were also some instances in May and June of 2022 in which Haroutunian transferred clients' payments from PayPal to the 1871 account. Doc. 114-1 ¶ 31; Doc. 106-17 at 83–84.

Haroutunian also testified that, at times, he transferred immigration revenues that he received in his personal accounts to Ballon Stoll's "loans and exchange" account. Doc. 114-1 ¶ 33; Doc. 106-17 at 16–21. Haroutunian explained that the loans and exchange account was an account that he used in his capacity as managing partner to transfer money into the firm when it was needed, and, when the firm had sufficient funds, transfer funds back to himself to repay the loans and exchanges. Doc. 106-17 at 19–21. Haroutunian also testified that he recorded these "loan and exchange" transactions in a spreadsheet titled "Loans to BSBN." *Id.*; Doc. 106-18. He clarified, however, that when he transferred immigration revenues from his personal accounts to Ballon Stoll's loans and exchange account, he did not consider these transactions loans to the firm, and they were not recorded as such in Ballon Stoll's bookkeeping. Doc. 106-17 at 19–20.

Haroutunian also had a personal Chase credit card, which he used for both personal and business expenses. Doc. 114-1 ¶¶ 41–42, 44. Ballon Stoll's employees and shareholders—including both Cutler and Haroutunian—used this card to pay for firm expenses, including, at times, on a daily basis. *Id.* ¶¶ 41–42; Doc. 106-17 at 74; Doc. 114-7 ¶ 15. Haroutunian testified that he would periodically download the account statements from this credit card, delineate which charges were firm expenses, and then provide this information to Ballon Stoll's accounting personnel. Doc. 106-17 at 107–08. Haroutunian also regularly used the funds from his 1871 account to make payments on this credit card. *Id.* at 33–34; Doc. 114-1 ¶ 43.

In total, approximately $4 million in immigration revenues were deposited into Haroutunian's three personal accounts from 2021 to 2022. Doc. 114-1 ¶ 62. Haroutunian contends that all of the immigration revenues that were deposited into his personal accounts were subsequently transferred to Ballon Stoll's accounts or used to pay firm expenses, and thus that there was no gain to him from the firm's immigration revenues over this period. Doc. 114-1 ¶ 63–64; Doc. 114-7 ¶ 18–19. He also asserts that these

revenues were recorded in Ballon Stoll's accounting records and reported in its tax returns. Doc. 114-1 ¶ 63–64; Doc. 114-7 ¶ 18–19.

Cutler, by contrast, claims that, of the approximately $4 million in immigration revenues, only approximately $1.5 million was transferred to Ballon Stoll accounts or used for Ballon Stoll expenses over the same period. Doc. 114-1 ¶ 63. As a result, he claims that "the net gain to Haroutunian (and diversion of funds from Ballon Stoll) from the immigration revenues for the period from January 2021 through December 2022 was" approximately $2.5 million.[15] *Id.* ¶ 64; Doc. 106-4 ¶¶ 57–59.

Cutler further contends that Haroutunian concealed these alleged diversions through denying him access to the firm's financial information. He asserts that, from the time that he became a shareholder through the end of 2021, he repeatedly requested information about Ballon Stoll's finances but was "consistently blocked" from receiving this information. Doc. 106-4 ¶ 16. Haroutunian, by contrast, asserts that Cutler "had access to or received whatever financial information [he] wanted, needed[,] or requested," including the firm's client files and retainer agreements, which disclosed the fees that clients were being charged for each immigration matter. Doc. 114-7 ¶ 11. Haroutunian further contends that Cutler was a signatory on Ballon Stoll's bank accounts and, by virtue of this status, had direct access to the firm's account statements and the bank's representatives. *Id.*; Doc. 114-8 at 2; Doc. 106-16 at 28–29.

---

[15] Cutler arrived at this estimate through "credit[ing]" certain categories of transfers from these accounts as firm expenses and subtracting that amount from the total immigration revenues received into the accounts. Doc. 106-4 ¶ 58. Cutler describes his methodology as follows:

> I credited all outgoing Zelle payments from [Haroutunian's three personal] accounts as firm expenses (with the exception of payments to "Danny Contractor" which Haroutunian testified was purely personal). I also included all transfers to Ballon Stoll, all transfers which Haroutunian testified that he knew were to or for Ballon Stoll, all transfers which were listed as business expenses in the immigration spreadsheets produced to partners, and all transfers which were part of the "loans" by Haroutunian produced as part of this litigation. I also double checked all unknown transfers against Ballon Stoll's operating account to ensure they were not transfers to Ballon Stoll missing from Haroutunian's spreadsheet. With all of these conservative assumptions, the total amount paid out from Haroutunian's personal account was $1,506,667.35.

*Id.* (citation omitted).

## II. PROCEDURAL HISTORY

Ballon Stoll filed its initial complaint on January 15, 2023. Doc. 1. In its complaint, Ballon Stoll named Cutler, CGW, and John and Jane Does 1–10 as defendants, as well as Cutler's uncle, David Cutler, and his CPA firm, David S. Cutler CPA, P.C. (collectively the "CPA Defendants"). *Id.* Cutler filed an initial counter-complaint on April 28, 2023, which asserted claims against Ballon Stoll and Haroutunian.[16] Doc. 30. Ballon Stoll then amended its complaint on June 6, 2023. Doc. 36. The amended complaint asserts claims for: (1) breach of fiduciary duty (against Cutler), (2) conversion (against all defendants), (3) unjust enrichment (against all defendants), (4) tortious interference with business relations (against all defendants), (5) conspiracy (against all defendants), and (6) an accounting (against Cutler and CGW). Doc. 36 at 9–21.

Cutler then filed a first amended counter-complaint on June 22, 2023, Doc. 41, and a second amended counter-complaint on July 2, 2023, Doc. 51. In the second amended counter-complaint—which is the operative counter-complaint—Cutler asserts four claims on his own behalf for: (1) breach of contract (against Ballon Stoll), (2) unjust enrichment (against Ballon Stoll), (3) an accounting (against Ballon Stoll), and (4) judicial dissolution (against Ballon Stoll and Haroutunian). *Id.* at 18–21. Cutler also asserts three claims against Haroutunian on behalf of Ballon Stoll derivatively, for breach of fiduciary duty, unjust enrichment, and an accounting. *Id.* at 21–22.

The CPA Defendants moved to dismiss the amended complaint as against them on personal jurisdiction and venue grounds. Doc. 45. The Court granted the motion on March 25, 2024. Doc. 63. After the close of discovery, Ballon Stoll and Haroutunian then filed their motion for summary judgment on February 28, 2026. Doc. 98. Cutler and CGW filed a cross-motion for summary judgment and motion for withdrawal of Cutler's admissions on April 15, 2026. Doc. 106. The motions are fully briefed.

---

[16] Although Cutler refers to Haroutunian as a counterclaim defendant, *see e.g.*, Doc. 106-2 at 8, as Haroutunian notes, he is, in fact, a third-party defendant because he was not a plaintiff in this case, Doc. 98-2 at 5.

## III. MOTION TO WITHDRAW CUTLER'S ADMISSIONS

Before the Court can proceed to the merits, it must first address a threshold issue regarding the record properly before it. In Ballon Stoll and Haroutunian's motion for summary judgment, they contend that Cutler has admitted several facts by failing to timely respond to their requests for admissions. Doc. 98-2 at 22–23; *see* Fed. R. Civ. P. 36(a)(3) ("A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection . . . ."). Cutler does not dispute that he failed to respond to the requests and moves for withdrawal and amendment of the admissions pursuant to Federal Rule of Civil Procedure 36(b).[17] Doc. 106-2 at 16–18; *see* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended.").

### A. Legal Standard

Federal Rule of Civil Procedure 36(a)(1) provides that a "party may serve on any other party a written request to admit . . . the truth of any matters . . . relating to: (A) facts, the application of law to fact, or opinions about either; and (B) the genuineness of any described documents." Fed. R. Civ. P. 36(a)(1). A matter is deemed admitted "unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney." Fed. R. Civ. P. 36(a)(3). While a matter that is admitted pursuant to Rule 36 is normally "conclusively established," a court "may," upon the motion of the party to whom the request is directed, "permit[] the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b).

---

[17] As Ballon Stoll and Haroutunian note, in bringing this motion, Cutler and CGW failed to comply with Local Rule 37.2 and this Court's individual practices, which require parties to request a pre-motion conference prior to filing any motion pursuant to Federal Rules of Civil Procedure 26 through 37 and 45. *See* Doc. 120 at 1–2; Loc. Civ. R. 37.2. The Court will nonetheless consider the motion in the interest of efficiency.

"[T]he decision to excuse the defendant from its admissions is in the [district] court's discretion." *Donovan v. Carls Drug Co.*, 703 F.2d 650, 651–52 (2d Cir. 1983). A district court is authorized to permit the withdrawal or amendment of an admission pursuant to Rule 36(b) "only when (1) the presentation of the merits will be aided *and* (2) no prejudice to the party obtaining the admission will result." *Id.* at 652.

"The first prong, promotion of the merits, is met where the withdrawal of or amendment to the admission will 'assist in the presentation of evidence on any claim or defense' in the action." *Cintron v. Albert Einstein College of Medicine*, No. 1:21-CV-06256 (JGK) (KHP), 2022 WL 3137079, at *1 (S.D.N.Y. Aug. 5, 2022) (quoting *Boyd v. Does It Even Matter, LLC*, 19 Civ. 5342 (DLI) (LB), 2021 WL 7209779, at *4 (E.D.N.Y. Apr. 8, 2021)). In considering whether the moving party has met this standard, courts have considered whether the movant has "shown that [its] admission may not accurately reflect the facts." *Id.* They have also considered whether the admission would preclude *any* presentation of the merits. *See, e.g.*, *River Light V, L.P. v. Lin & J International, Inc.*, 299 F.R.D. 61, 64 (S.D.N.Y. 2014) (permitting withdrawal because Rule 36 is meant to "narrow the issues for trial to the parties' core disputes," not "ask[] [the opposing party] to concede much or all of the litigation by admitting to" ultimate issues of liability); *Triano v. Barone*, No. 09 Civ. 6319 (PED), 2015 WL 13879879, at *6 (S.D.N.Y. May 15, 2015) (holding that withdrawal would promote the presentation of the merits because the requests "asked Plaintiff to concede much of his case by admitting that Defendant did not violate Plaintiff's rights or cause him damage, admissions which would substantially negate Plaintiff's lawsuit").

The second prong, which asks whether the requesting party will be prejudiced by withdrawal, "does not require that a withdrawal not prejudice the requesting party." *River Light V*, 299 F.R.D. at 63. That is because "withdrawal of a deemed admission will almost always be to the requesting party's detriment." *Id.* Instead, the second prong "requires no prejudice to the requesting party's ability to 'maintain[] or defend[] the

action *on the merits*.'" *Id.* (quoting Fed. R. Civ. P. 36(b)). In other words, the inquiry centers around "the special difficulties a party may face caused by a sudden need to obtain evidence upon withdrawal or amendment of an admission." *Id.* at 63–64 (quoting *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 154 (6th Cir. 1997)).

Moreover, "[b]ecause the language of the Rule is permissive, the court is not required to make an exception to Rule 36 even if both the merits and prejudice issues cut in favor of the party seeking exception to the rule." *Donovan*, 703 F.2d at 652; *see also Cement & Concrete Workers District Council Welfare Fund v. Manny P. Concrete Co.*, 145 F.4th 204, 209–10 (2d Cir. 2025) (affirming a district court's admission pursuant to Rule 36(b) on these grounds). In considering whether to exercise this discretion, courts may consider whether the moving party has shown good cause for the delay. *River Light V*, 299 F.R.D. at 64.[18] In ruling on Rule 36(b) motions, courts should also "keep in mind the underlying policy of Rule 36 'to narrow issues and speed the resolution of claims.'" *Beberaggi v. New York City Transit Authority*, No. 93 Civ. 1737 (SWK), 1994 WL 18556, at *3 (S.D.N.Y. Jan. 19, 1994) (quoting *Donovan*, 703 F.3d at 652).

**B. Discussion**

*1. Timeliness of Cutler's Response*

The record plainly demonstrates that Cutler failed to timely respond to the requests for admissions: although he was served with the requests on October 1, 2024, Doc. 98-14, he did not attempt to respond to them until nearly two years later, when he filed his opposition to Ballon Stoll and Haroutunian's motion for summary judgment and his cross-motion for summary judgment on April 15, 2026, Doc. 106-24. Nor did Cutler

---

[18] Courts in this Circuit are split, however, as to whether a movant is *required* to demonstrate good cause for the delay to receive Rule 36(b) relief. Some have held that "a party that has inexcusably failed to comply with requirements set forth by Rule 36(a)" cannot withdraw his admissions pursuant to Rule 36(b), because the contrary rule would frustrate Rule 36(a)'s 30-day compliance period. *See Ng v. HSBC Mortgage Corp.*, No. 07-CV-5434 (RRM) (VVP), 2011 WL 3511296, at *4 (E.D.N.Y. Aug. 10, 2011) (collecting cases). Others have held that a movant need not demonstrate "excusable neglect" if withdrawal would otherwise promote the presentation of the merits and not unfairly prejudice the requesting party. *See River Light V, L.P. v. Lin & J International, Inc.*, 299 F.R.D. 61, 64 (S.D.N.Y. 2014) (collecting cases).

seek an extension of his deadline to respond to the requests in the intervening period. Fed. R. Civ. P. 36(a)(3) (noting that a "shorter or longer time for responding may be stipulated to under Rule 29 or be ordered by the court"). Thus, his failure to respond to any properly asserted request functions as an admission pursuant to Rule 36(a)(3).

*2. Presentation of the Merits*

Cutler argues that the withdrawal of certain of these admissions would promote the presentation of the merits because they are contradicted by the record in this case.[19] Doc. 106-2 at 17. In particular, he argues that he should be permitted to withdraw his admission that he "tendered" and "relinquished [his] ownership interest in Ballon Stoll" upon the effective date of his resignation, *i.e.*, December 22, 2022, because, in the operative counter-complaint, he alleged that "[a]lthough [he] ended his employment at Ballon Stoll, he never transferred or forfeited his 30% shareholder interest in Ballon Stoll."[20] Doc. 106-2 at 17 (quoting Doc. 51 ¶ 85).

Cutler's representations in this regard, however, have not been consistent. Indeed, elsewhere in his papers, Cutler explicitly relies on his position as a "*former* shareholder" to resist the claims against him, asserting that, by virtue of this status, he was not required to "continue to assist in finalizing, organizing, and collecting . . . receivables" for his

---

[19] Although, in his proposed responses, Cutler denies several of the requests, in his motion, he focuses only on a subset of the requests—namely, those seeking admissions that he "tendered" and "relinquished" his ownership interest in Ballon Stoll effective December 22, 2022. *See* Doc. 106-2 at 17; Doc. 119 at 7. Because Cutler does not argue that the withdrawal of any other admission would promote the presentation of the merits, he has waived any such argument for the purposes of this motion. *See Centrifugal Acquisition Corp. v. Moon*, 267 F.R.D. 240, 241 (E.D. Wis. 2010) (noting that "those seeking to withdraw the admissions . . . bear the burden of demonstrating that the merits will be 'subserved or facilitated by ordering the withdrawal of the admissions'" (quoting *Ropfogel v. United States*, 138 F.R.D. 579, 583 (D. Kan. 1991))). Thus, the Court focuses only on the admissions that Cutler tendered and relinquished his ownership interest in Ballon Stoll effective December 22, 2022.

[20] In his reply, Cutler also argues that these admissions are contradicted by his declaration and deposition testimony, in which he avers that he "never signed any document or instrument transferring [his] 30% shareholder interest in Ballon Stoll," that "[n]o shareholder or officer or Ballon Stoll" ever asked him to do so, Doc. 106-4 ¶¶ 36–37, and that "until [he is] bought out, [he is] still a shareholder" even though "there is no specific agreement stating such terms," Doc. 98-21 at 39–40. Of course, "[i]t is well settled in the Second Circuit that a party may not raise an argument for the first time in his reply brief." *U.S. ex rel. Morgan v. McElroy*, 981 F. Supp. 873, 876 n.3 (S.D.N.Y. 1997) (collecting cases).

client-related work after he had resigned from the firm. Doc. 119-1 ¶ 42 (emphasis added). And, in the back and forth that followed his resignation email, Cutler repeatedly argued that he was justified in retaining the firm's funds because he could not count on being compensated after he left the firm. *See* Doc. 98-9 at 3 ("However, what you are asking me to do, leave the firm with the firm owing me in excess of a quarter million dollars in [the] hope that I will be paid that plus the very significant sum I will be owed for post leaving collectibles, is not something I am comfortable doing."); *id.* at 7 ("To ask me to, in essence, loan more money into the firm on the hope that I will one day be paid back after I leave the firm is unfair . . . ."). The foregoing statements are inconsistent with an intent to retain his position as a shareholder in the firm. In exchanges with his fellow shareholders prior to his resignation, Cutler also repeatedly explained that his "goal [was] to ensure that [he was] able to walk out *with neither [him] nor the firm owing any obligations to each other*." Doc. 98-8 at 3, 5 (emphasis added); *see also* Doc. 98-9 at 6 ("The goal for this last month or so is to make sure that I can walk out of the firm not owing anything to the firm and the firm not owing me anything either."). But, if Cutler retained his interest in the firm after his resignation, he would undoubtably owe fiduciary obligations to the firm and his fellow shareholders—and, as an attorney, it would stand to reason that Cutler was aware of this fact. Thus, Cutler's contention that, in tendering his resignation, he intended to retain his status as a shareholder or communicate as much is at least arguably belied by his own representations. Therefore, it is not clear that the relevant admission "may not accurately reflect the facts" and would thus promote a decision on the merits. *Cintron*, 2022 WL 3137079, at *1.

*3. Prejudice to the Requesting Parties*

Moreover, even if withdrawal would promote a decision on the merits, it would not be warranted because Ballon Stoll and Haroutunian would be prejudiced. Discovery closed months ago and, as Ballon Stoll and Haroutunian explain in their brief, Doc. 114 at 6–7, they have relied on these admissions for nearly two years without any indication

from Cutler that he intended to withdraw them—including in their motion for summary judgment. *See Ng v. HSBC Mortgage Corp.*, No. 07-CV-5434 (RRM) (VVP), 2011 WL 3511296, at *4 (E.D.N.Y. Aug. 10, 2011) (finding prejudice under similar circumstances). As other courts have recognized, permitting the amendment of admissions at such a late stage "would deprive [the non-movants] of the ability to conduct additional discovery concerning those answers." *Id.* (denying amendment where discovery had closed, the non-movants had "relied on those admissions in their motion for summary judgment," and the amendment was requested "more than two years after the initial admissions"); *see also Manny P. Concrete Co.*, 145 F.4th at 209 (affirming the denial of a request to withdraw admissions where discovery had closed "nearly two years" prior and the movants had "ignore[d] the request" for "more than a year," including "through the close of discovery").

In fact, the Court is not aware of any cases in this Circuit that have granted a withdrawal request under similar circumstances. Nor does Cutler identify any such cases. Rather, the courts that have found that amendment would not prejudice the non-movant have typically done so where discovery had not yet or only recently concluded. *See, e.g.*, *Albert Einstein*, 2022 WL 3137079, at *2 (finding no prejudice where the "action [was] still in the discovery stage, and Plaintiff ha[d] plenty of time to obtain any additional evidence if needed"); *Citron Pharma LLC*, 2018 WL 3442542, at *5 (finding no prejudice where the parties were "relatively early in the discovery process" and the non-movant "w[ould] be able to pursue further discovery on the issue, to present its own witnesses, and to raise the issue at deposition"); *River Light V*, 299 F.R.D. at 64 (finding no prejudice where "[f]act discovery remain[ed] open" for several more weeks); *Hecht v. New York University*, No. 25 Civ. 3042 (PAE), 2025 WL 3677977, at *2 (S.D.N.Y. Dec. 18, 2025) (finding no prejudice where the court could allow the non-movants to "serve an additional round of [requests for admissions]" based on the untimely response, with responses "due well before summary judgment briefing").

Perhaps in recognition of this infirmity, Cutler argues in his reply that Ballon Stoll and Haroutunian cannot be prejudiced by the withdrawal because they "deposed Cutler on his continued shareholder position and had the opportunity to seek additional documents during discovery if they believed more were needed." Doc. 119 at 8. But the relevant deposition questioning and testimony represents just a single page of a nearly five-hundred-page transcript.[21] Doc. 98-21 at 39–40. Moreover, as Ballon Stoll and Haroutunian note, they did not pursue any additional discovery regarding the ownership issue precisely "*because of* Cutler's admission to these requests." Doc. 114 at 7 (emphasis added). And they were well within their rights to rely on these admissions: as the advisory committee notes to Rule 36 explain, "[u]nless the party securing an admission can depend on its binding effect, he cannot safely avoid the expense of preparing to prove the very matters on which he has secured the admission, and the purpose of the rule is defeated." That is especially so here, given that discovery has closed and nearly two years have passed between the time that Cutler was first served with the requests for admissions and when he finally responded the requests.

*4. Good Cause for the Delay*

Finally, the Court notes that, even if both Rule 36(b) criteria were met, it would not permit the withdrawal of the admissions because Cutler has not shown good cause for his failure to respond to the requests. *See Manny P. Concrete Co.*, 145 F.4h at 209–210; *Ng*, 2011 WL 3511296, at *4. In his motion, Cutler attributes his delayed response to the fact that the requests were served "the night before the Jewish holiday of Rosh Hashanah, when it was no secret that Cutler (and his counsel) would be unavailable for several days (and would shortly after head into additional High Holidays)." Doc. 106-2 at 17. In other words, Cutler suggests that his failure to respond to the requests was caused by

[21] In addition, the relevant portion of the transcript focuses on whether there was an *agreement* pursuant to which Cutler would be permitted to resign from the firm and retain his shareholder interest—not whether Cutler did, in fact, tender his ownership interest along with his resignation. Doc. 98-21 at 39–40.

Ballon Stoll and Haroutunian's bad faith decision to serve the requests on the evening of October 1, 2024. In support of this contention, Cutler also notes that Ballon Stoll and Haroutunian failed to "mention" the requests for admissions until they filed their motion for summary judgment. *Id.*

This argument is unpersuasive. For one, Cutler's suggestion that the timing of Ballon Stoll and Haroutunian's service of the requests was suspect is plainly belied by the record. As Ballon Stoll and Haroutunian highlight, the parties jointly agreed in their proposed discovery plan and scheduling order that any requests for admissions would be served by October 1, 2024. Doc. 67 at 2. Given that Cutler agreed to this deadline, the Court cannot see how there is anything untoward about Ballon Stoll and Haroutunian's compliance with it. In fact, Cutler's suggestion that this timing was motivated by gamesmanship borders on frivolous.

Insofar as Cutler means to argue that his own delay in responding to the requests was attributable to his religious observance, the Court also does not consider that explanation to be credible for several reasons. First, Cutler does not argue that he was unavailable to respond to the requests or request an extension of his deadline to do so for the entire 30-day response period. Rather, Cutler concedes that Rosh Hashanah only spanned "several days" and that his observance of the remaining High Holidays would begin at some period "shortly after." Doc. 106-2 at 17. Yet, Cutler does not explain why he failed to request an extension of his response deadline in this intervening period, especially given his knowledge of his upcoming religious observance. Second, it bears repeating that, to the extent that Cutler was concerned about his ability to timely respond to discovery requests during this period, the problem was of his own making, insofar as he agreed to the October 1, 2024, deadline for requests for admissions in the joint discovery plan and scheduling order. Doc. 67 at 2. Third, and more fundamentally, even if Cutler was unavailable for the entirety of his response period for religious reasons, that

excuse does not explain why he failed to respond to the requests after the High Holidays—or in the nearly two-year period that followed.

Finally, Cutler's suggestion that Ballon Stoll and Haroutunian should have reminded him of his discovery deadline plainly lacks merit. Cutler does not dispute that he was properly served with the requests by the agreed-upon deadline. Counsel for Ballon Stoll and Haroutunian was under no obligation to remind him of the consequences of his failure to comply with Rule 36's self-executing provisions.

In sum, the Court finds that Cutler's proffered excuses for his nearly two-year long delay are unconvincing. Accordingly, Cutler has not shown good cause for his failure to comply with Rule 36(a)'s requirements. For the reasons set forth above, the Court denies his motion for Rule 36(b) relief.

## IV. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.*

The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant is the plaintiff, this requires him to demonstrate that his "own submissions in support of the motion must entitle [him] to judgment as a matter of law." *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 618 (2d Cir. 1998). In other words, a plaintiff who moves for summary judgment must "show, as a matter of law, that he can establish all elements of his claim by a preponderance of the

evidence and that no questions of material fact exist for a jury to decide." *Farrell v. Burke*, No. 97 Civ. 5708 (DAB), 2004 WL 2813175, at *3 (S.D.N.Y. Dec. 8, 2004), *aff'd*, 449 F.3d 470 (2d Cir. 2006). To do so, he "must lay out the elements of its claim, citing the facts [he] believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing." 10A *Wright & Miller's Federal Practice & Procedure* § 2721.1 (4th ed. 2026). "If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response." *Id.*; *see, also*, *Peterson v. Pan Am Railways, Inc.*, No. 1:12-CV-1857 (LEK) (CFH), 2015 WL 2451227, at *8 (N.D.N.Y. May 21, 2015) (noting that the plaintiff's failure to "undisputably establish" an "essential element of [his] claim" was "fatal to [his] [m]otion for summary judgment"). If, however, the movant meets his initial burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester County*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.").

**B. Ballon Stoll's Claims Against Cutler & CGW**

Ballon Stoll asserts six claims against the defendants: (1) breach of fiduciary duty (against Cutler), (2) conversion (against all defendants), (3) unjust enrichment (against all defendants), (4) tortious interference with business relations (against all defendants), (5) conspiracy (against all defendants), and (6) an accounting (against Cutler and CGW). Ballon Stoll moves for partial summary judgment solely on its breach of fiduciary claim and only as to Cutler's liability on that claim; it otherwise reserves the issue of damages for subsequent proceedings. Doc. 98-2 at 11. Cutler and CGW move for summary judgment on all six of Ballon Stoll's claims.[22] Doc. 106-2 at 9–12.

[22] In a letter filed on July 13, 2026, Ballon Stoll and Haroutunian request that the Court strike certain portions of Cutler and CGW's reply brief, because, in their view, the brief contains "unauthorized sur-reply arguments." Doc. 120 at 1. However, as Cutler and CGW note, this request is overbroad insofar as it fails to recognize the overlapping nature of the parties' motions. Doc. 121. For example, Ballon Stoll and Haroutunian seek to strike all arguments in Cutler and CGW's reply brief regarding Ballon Stoll's breach of fiduciary duty claim against Cutler and CGW. But Cutler and CGW also cross-moved for summary judgment on this claim; thus, they were entitled to respond to Ballon Stoll's arguments in opposition to their cross-motion in their reply. The same is true for Cutler and CGW's cross-motion for summary judgment on Ballon Stoll's remaining claims.

To be clear, in their reply brief, Cutler and CGW may only *respond* to Ballon Stoll and Haroutunian's arguments in opposition to their cross-motion; they cannot to raise new arguments in opposition to Ballon Stoll and Haroutunian's initial motion that they neglected to raise in their own opposition brief. Thus, insofar as Cutler's reply brief responds for the first time to Ballon Stoll's argument that his unjust enrichment claim is duplicative, the Court will disregard this argument because it should have been raised in Cutler's opposition brief. *See* Doc. 119 at 16. Ballon Stoll and Haroutunian's request to strike the remaining portions of Cutler and CGW's reply brief is otherwise denied.

*1. Breach of Fiduciary Duty Claim Against Cutler*

In New York, to prevail on a breach of fiduciary duty claim, "a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol*, 835 N.Y.S.2d 644, 646 (2d Dep't 2007). "[L]aw partners, no less than any other business or professional partners, are bound by a fiduciary duty requiring 'the punctilio of an honor the most sensitive.'" *Graubard Mollen Dannett & Horowitz v. Moskovitz*, 86 N.Y.2d 112, 118 (1995) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928)). The fiduciary duties that apply to law firm partners extend to attorney-shareholders of professional corporations. *See Santalucia v. Sebright Transportation, Inc.*, 232 F.3d 293, 299 (2d Cir. 2000); *Weinberg v. Picker*, 99 N.Y.S.3d 421, 426 (2d Dep't 2019).

A fiduciary has a duty of loyalty and good faith, and to "refrain from acting for purely private gain." *Gibbs v. Breed, Abbott & Morgan*, 710 N.Y.S.2d 578, 581 (1st Dep't 2000). These fiduciary duties are breached when a "partner diverts for non-partnership purposes monies belonging to the partnership." *In re Monetary Group*, 2 F.3d 1098, 1104 (11th Cir. 1993) (applying New York law). Because law firm revenues belong to the firm, "[a] law firm partner may thus breach his or her fiduciary duty by failure to record, or to facilitate the firm's collection of fees for, billable hours for work performed while a partner at the firm." *Weir v. Holland & Knight, LLP*, 34 Misc. 3d 1207(A), 943 N.Y.S.2d 795, 2011 WL 6973240 (N.Y. Cty. Sup. Ct. Dec. 9, 2011) (citing *Jackson & Nash LLP v. E. Timothy McAuliffe PLLC*, 915 N.Y.S.2d 40 (1st Dep't 2010)); *see also*, *e.g.*, *Roche Freedman LLP v. Cyrulnik*, 703 F. Supp. 3d 404, 426 (S.D.N.Y. 2023) (allowing a breach of fiduciary duty claim to proceed where a law firm partner "failed to enter his time," "refused to provide his time entries upon the [f]irm's request," and "discourag[ed] his clients from paying their invoices").

*a. Ballon Stoll's Motion for Summary Judgment*

Ballon Stoll argues that Cutler breached his fiduciary duties through "intentionally withholding from Ballon Stoll the hours and details of client-related work he performed between March 2022 and December 2022," "refusing to cooperate with Ballon Stoll to bill and collect for Ballon Stoll for [these] services," and "misappropriat[ing] at least $191,000 in clients' payments between October 2022 and December 2022."[23] Doc. 98-2 at 12. Ballon Stoll argues that it is entitled to partial summary judgment on this claim because in *Weir v. Holland & Knight, LLP*, a New York trial court granted summary judgment to a law firm partnership based on substantially similar facts. *Id.* at 13–14.

In *Weir*, a law firm asserted a claim against its former partner for breach of fiduciary duty based on his "failure to cooperate with billing of clients of the firm during the nine months before his expulsion, and his billing for and collection of such fees from clients after the expulsion." *Weir*, 2011 WL 6973240, at *11. In defending against this claim, the former partner in *Weir* did not dispute that he had failed to submit time sheets for approximately nine months, that the law firm was entitled to fees for this client-work, or that the law firm had repeatedly requested these time sheets. *Id.* at *3. Based on these undisputed facts, the court held that the law firm was entitled to summary judgment as to liability. *Id.* at *11. In reaching this conclusion, the court noted that, in general, the partner had fiduciary duty to refrain from diverting funds from the partnership. *Id.* It also explained that, in New York, courts have found that a partner breaches this duty "by fail[ing] to record, or to facilitate the firm's collection of fees for, billable hours for work performed while a partner at the firm." *Id.* (citing *Jackson & Nash LLP*, 915 N.Y.S.2d at 40). Because the undisputed record showed that the former partner "refused to cooperate

[23] Ballon Stoll derives this $191,000 figure from a November 18, 2022, email in which Cutler stated that he had "recently received two payments[,] $95,363 in . . . funds received form David Cutler and $300 from" another client. Doc. 98-9 at 7. From this statement, Ballon Stoll asserts that Butler received "two payments of $95,363.00 from one client, and a $300 payment from another client." Doc. 106-1 ¶ 34. But given that Cutler stated, in the same email, that he was "using *that* $95,663 to pay off" the compensation that he contended that he was owed, the Court understands that the "two payments" Cutler received were the $95,363 and the $300 payments. Doc. 98-9 at 7 (emphasis added).

with billing in the nine months prior to his expulsion, and in fact collected fees that would otherwise have been due the firm," the court concluded that he had breached his fiduciary duties to the firm. *Id.* at *11–12.

The Court agrees that Ballon Stoll is entitled to partial summary judgment under *Weir* and the cases cited therein. *Accord Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*, 22 F.4th 103, 120 (2d Cir. 2021) ("[W]e look to the rulings of the state's lower courts as providing important data points for understanding state law."). Here, as in *Weir*, the undisputed record shows that Cutler failed to bill for all the client-related work that he conducted in the months leading up to his departure or share details regarding this work in a manner that would allow Ballon Stoll to bill for and collect on this work independently. Indeed, Cutler concedes that the only billing information that Ballon Stoll possessed regarding his post-March 2022 work was the May through July Google documents that Mortland created, which were incomplete as to those months and lacked any information regarding his hours in any month after July. Cutler also concedes that he withheld access to this billing information intentionally: he explains that he terminated Mortland's access to his Gmail account and the September Google document "because things between [him] and the firm had substantially deteriorated," Doc. 119-1 ¶ 40, and continued to withhold this information because of Ballon Stoll's "refus[al]" to "work out a deal to work together on the billing," Doc. 106-4 ¶ 53.

Text messages that Cutler sent prior to and following his departure also make clear that he understood the consequences of withholding his cooperation with the firm. Indeed, just before he cut off Mortland's access to his Gmail and the September billing document, Cutler explained to Stillman that the shareholders' "accusations" "mean[t] no more timesheets[,] which will ultimately cost everyone a bunch of money." Doc. 114-16 at 2. And, in a declaration that Cutler offers in support of his motion, he concedes that this "message referred to the fact that, after relations had broken down, there would be no further cooperative *completion* and clean-up of the timesheet process going forward."

Doc. 119-1 ¶ 41 (emphasis added). After Cutler resigned from the firm, he also acknowledged that "[t]he firm has the right to collect on [his] receivables" and "need[ed] [his] cooperation" "if they want[ed] to do that." Doc. 98-5 at 2. But Cutler made clear to Stillman that the firm "won't have that" cooperation "if [he was] not paid what [he was] owed." *Id.* In a declaration that Cutler offers in support of his motion, Cutler concedes that, in making these statements, he was expressing his view that, as a "former shareholder," he was not required to "continue to assist in finalizing, organizing, and collecting those receivables after relations had deteriorated and litigation had begun." Doc. 119-1 ¶ 42.

But, as Cutler himself recognized, the fees incurred for his billable work were firm revenues. *See* Doc. 98-5 at 2 (acknowledging that "[t]he firm has the right to collect on [his] receivables"). And, as a fiduciary, Cutler had a duty to record and facilitate the firm's collection of those fees. *Weir*, 2011 WL 6973240, at *11. Thus, Cutler had no right to withhold this information or his cooperation based on his unilateral determination that relations between him and the firm had deteriorated or his desire to "work out a deal." Doc. 106-4 ¶ 53.

In addition, as in *Weir*, it is also undisputed that Cutler "in fact collected fees that would otherwise have been due the firm." *Weir*, 2011 WL 6973240, at *11. In his November 18, 2022, email to his fellow shareholders, Cutler explicitly stated that he had "recently received two payments" for billable work that the firm "recently did for" two clients, and that, rather than returning those funds to the firm, he was "using that $95,663 to pay off the 2021 referrals owed, the expenses owed[,] and $3446.22 of the 2022 referrals."[24] Doc. 98-9 at 7. Cutler then explained that, while he was "not running around asking clients to pay [him] instead of the firm," he was "not fighting it either," and

[24] In a declaration that Cutler offers in support of his motion, Cutler also admits that "there were additional client payments of $95,663 which [he] applied toward referral monies owed by Ballon Stoll to [him] from 2021 and a small portion of 2022." Doc. 106-4 ¶ 63.

would "account for every penny [he] received" from clients "and how it's being applied" to offset the compensation that he believed he was owed by the firm. *Id.* When, in response, Haroutunian noted that Cutler had "admitted . . . that [he] diverted the firm's funds to [him]self," Cutler replied that he would "be happy to send the money to the firm," but only "[i]f [Haroutunian] would like to fully work through how much [Cutler] [was] owed and pay the full amount." *Id.* at 3-4. And after Cutler left the firm, he doubled down on his promise to collect and withhold client payments: he told Stillman that "if [he was] not paid what [he was] owed," he had "no problem collecting the amount [he was] owed, applying it against what [he was owed,] and then" leaving the firm to "go out and do it's [sic] best to collect the rest." Doc. 106-1 ¶ 37.

When Cutler first retained these funds, he does not appear to have offered any legal justification for this practice. And, in his briefs, Cutler cites to no authority that suggests that he was entitled to engage in this kind of self-help. At most, Cutler argues that his actions were not wrongful because it was "expressly disclosed by [him] at the time" and therefore "not a hidden diversion of funds." Doc. 119-1 ¶ 46. But regardless of Cutler's candor, the funds were not his to withhold. If he believed that the firm owed him compensation, he should have sought redress through the legal process. *See Weir*, 2011 WL 6973240, at *2 (rejecting a former partner's argument that he was entitled to withhold timesheets as a "restrained countermeasure" to the law firm's allegedly "wrongful" acts because the partner "wholly fail[ed] . . . to submit legal authority that his withholding of time sheets was an act of self-help that was justified based on his claim of wrongdoing"). Based on the foregoing, Ballon Stoll has made a prima facie showing that Cutler is liable for breaching his fiduciary duties to the firm.

In opposing Ballon Stoll's motion, Cutler offers several arguments. First, Cutler highlights that his conduct "did not violate any explicit or written policy of Ballon Stoll regarding submission of billing." Doc. 106-2 at 10. But, as the court in *Weir* observed in addressing a nearly identical argument, "[t]his contention misapprehends the basis for

[Ballon Stoll's] breach of fiduciary cause of action, which is not merely that [Cutler] failed to perform the clerical duty of submitting time sheets, but that he failed to cooperate with billing for clients of the firm and diverted fees from the firm." *Weir*, 2011 WL 6973240, at *11–12. Thus, Cutler's focus on the absence of any formal billing policy is misplaced.

Cutler also argues that "delays in collecting time entries and issuing invoices were endemic to the firm" and that the "myriad efforts" that he undertook "to obtain assistance for the tasks related to timekeeping and billing" confirm that he "did not intentionally withhold any billing records or information from Ballon Stoll." Doc. 106-2 at 10. However, the only support he offers for this contention is the evidence of his efforts to hire a billing assistant and create the past-due billing records with Mortland. *Id.* But given what the undisputed record shows about Cutler's abrupt withdrawal from these efforts and subsequent decisions to withhold billing information and client fees from the firm, this evidence does not suffice to create a genuine issue of fact. Ballon Stoll's motion for summary judgment as to liability on its breach of fiduciary duty claim is therefore granted. Cutler's cross-motion for summary judgment on this claim is accordingly denied.

*2. Remaining Claims Against All Defendants*

*a. Cutler & CGW's Motion for Summary Judgment*

Cutler and CGW also move for summary judgment on Ballon Stoll's remaining claims for conversion, unjust enrichment, tortious interference with business relations, conspiracy, and an accounting. Doc. 106-2 at 11–12. However, the only argument that they offer in support of their motion is the following assertion: "With regard to conversion, the evidence establishes that Cutler worked with Ballon Stoll after he left to have Ballon Stoll invoices sent out to clients for work done while Cutler was at Ballon Stoll and he collected a total $90,962.29 from four different clients which is being held in a separate interest-bearing account pending the results of this litigation." *Id.* Cutler and

CGW then contend that "the same facts necessarily defeat the similarly-plead[ed] claims for unjust enrichment, tortious interference, and for an accounting." *Id.* at 12.

These conclusory assertions, however, are not accompanied by any citation to legal authority. Nor do Cutler or CGW attempt to engage with the different legal standards that to apply to these claims—or explain why the undisputed evidence entitles them to summary judgment under those standards as a matter of law. In the absence of any attempt to engage in legal reasoning or argumentation, the Court will not consider these contentions. *Government Employees Insurance Co. v. Strut*, 758 F. Supp. 3d 140, 149 (W.D.N.Y. 2024) ("A skeletal argument, unsupported by relevant authority or reasoning, is merely an assertion which does not sufficiently raise the issue to merit the court's consideration."); *United States v. Javier Figueroa*, No. 18-CR-6094 (FPG), 2020 WL 3481454, at *2 (W.D.N.Y. June 26, 2020) (rejecting as waived "generalized, conclusory arguments that are unsupported by citation to record evidence or legal authority"). Cutler and CGW's motion for summary judgment on Ballon Stoll's conversion, unjust enrichment, tortious interference with business relations, conspiracy, and accounting claims is therefore denied.

**C. Cutler's Claims Against Ballon Stoll & Haroutunian**

In his counter-complaint, Cutler asserts four claims on his own behalf and three claims on behalf of Ballon Stoll derivatively. Doc. 51 at 18–22. The Court addresses each set of claims in turn.

*1. Direct Claims*

*a. Breach of Contract Claim Against Ballon Stoll*

In New York, to prove a breach of contract claim, a plaintiff must show that: (1) a contract exists, (2) the plaintiff performed in accordance with the contract, (3) the defendant breached its contractual obligations, and (4) the defendant's breach resulted in damages. *34-06 73, LLC v. Seneca Insurance Co.*, 39 N.Y.3d 44, 52 (2022).

*i. Ballon Stoll's Motion for Summary Judgment*

Ballon Stoll argues that it is entitled to summary judgment on this claim because Cutler has not shown the existence of any valid contract, breach, or damages. Doc. 98-2 at 14–15. It argues that Cutler has not established the existence or breach of a contract because Cutler has not shown the existence of any agreement that was sufficiently definite. Doc. 98-2 at 16

In New York, courts impose a "requirement of definiteness," such that "[i]f an agreement is not reasonably certain in its material terms, there can be no legally enforceable contract." *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989). Thus, "[e]ven if parties intend to be bound by a contract, it is unenforceable if there is no meeting of the minds, i.e., if the parties understand the contract's material terms differently." *Gessin Electrical Contractors, Inc. v. 95 Wall Associates, LLC*, 903 N.Y.S.2d 26, 28 (1st Dep't 2010).

New York courts have warned, however, that "[t]he conclusion that a party's promise should be ignored as meaningless 'is at best a last resort.'" *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483 (quoting *Heyman Cohen & Sons v. M. Lurie Woolen Co.*, 232 N.Y. 112, 114 (1921))*; see also id.* (noting that "if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract" and that "courts should not be 'pedantic or meticulous' in interpreting contract expressions"). Thus, "[b]efore rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear." *Id*. And "[t]o determine whether parties to an oral agreement manifested 'mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms, . . . the court looks not to the parties' after-the-fact professed subjective intent, but rather at their objective intent as manifested by their expressed words and conduct at the time of the agreement.'" *Westside Winery, Inc. v. SMT Acquisitions, LLC*, No. 2:19-CV-4371 (JMA) (SIL), 2022

WL 4329735, at *4 (E.D.N.Y. Sept. 19, 2022) (quoting *Kelly v. Bensen*, 58 N.Y.S.3d 169, 172 (3d Dep't 2017)). Ultimately, whether there was a meeting of the minds that resulted in a binding agreement, and under which terms, is a question of fact. *Westside Winery, Inc. v. SMT Acquisitions, LLC*, No. 2:19-CV-4371 (JMA) (SIL), 2022 WL 4329735, at *4 (E.D.N.Y. Sept. 19, 2022) (citing *Interocean Shipping Co. v. National Shipping & Trading Corp.*, 523 F.2d 527, 534 (2d Cir. 1975); *Martin H. Bauman Associates, Inc. v. H & M International Transport, Inc.*, 567 N.Y.S.2d 404, 407 (1st Dep't 1991)).

Ballon Stoll contends that Cutler has not satisfied this requirement because, "[d]uring his deposition, [he] could not articulate or provide details concerning the terms of an agreement, much less identify what terms, if any, were actually breached and when or how." Doc. 98-2 at 15. But to prove that the alleged contract is sufficiently definite, Cutler is not limited to the representations in his deposition testimony. Rather, he is entitled to rely on any admissible evidence to support his claim. Thus, even if Cutler's deposition testimony is insufficient to meet his burden, that fact does not itself defeat his claim. Moreover, although Cutler's deposition responses were not a model of clarity, he did ultimately testify that there was an agreement between himself and Ballon Stoll regarding his compensation and provide details of the terms therein. Doc. 98-21 at 10–15. In his declaration, Cutler also offers testimony that is largely consistent with the description that he provided during his deposition. Doc. 106-4 ¶ 15.

To be sure, the parties dispute certain terms of their compensation agreement: while Cutler asserts that he was entitled to overtime compensation, Ballon Stoll disputes the existence of any agreement to pay Cutler for his hourly work beyond the standard $75 rate. Doc. 114-1 ¶ 12; Doc. 98-6 ¶ 14. The parties also dispute Cutler's performance terms under the agreement. Haroutunian, Bellovin, and Stillman all offered testimony that Cutler was required to accurately bill, invoice, and collect for services that he or other staff performed for his clients. Doc. 106-1 ¶¶ 11–15. Haroutunian further asserted that, in "with[olding] billing and time information" and "interfer[ing] with Ballon Stoll's

ability to bill clients for" services that he performed from April to November 2022, Cutler forfeited his right to compensation under the parties' agreement. Doc. 114-7 ¶¶ 20–21. Cutler, by contrast, suggests that "his performance under the contract" simply required that he engage in hourly work and refer clients who eventually paid the firm.[25] Doc. 106-2 at 12 (citing Doc. 106-4 ¶¶ 61–62). But the fact that the parties presently dispute the agreement's terms does not necessarily mean that the agreement was indefinite when it was entered. *Westside Winery, Inc.*, 2022 WL 4329735, at *5 ("That the parties subsequently disputed the oral agreement's terms does not mean there cannot be a question of fact as to whether they had a meeting of the minds at the time of contracting."). At summary judgment, it simply means that whether the parties, in fact, had a meeting of the minds to create a valid contract is in dispute.

Because Cutler has offered testimony that the parties reached an agreement with certain terms, summary judgment as to this factual issue would be inappropriate.[26] *Id.* at *4 (holding that a plaintiff's testimony that the parties "reached an agreement and

---

[25] The Court notes that Cutler's understanding of his performance obligations is not entirely clear from his brief. There, he merely asserts, in a conclusory manner, that he has "established . . . his performance under the contract." Doc. 106-2 at 12. But beyond this vague assertion, Cutler does not identify the nature of his contractual obligations to the firm, or how his actions satisfied those obligations. In support of this contention, Cutler does cite—without further explanation—to certain paragraphs of his declaration testimony, in which he states that "[b]etween April 1, 2022 and November 30, 2022, [he] worked a total of 1,545.30 hours," and "as of the end of November [2022], [he] had collected $1,168,327.72 from over forty different clients for work done at Ballon Stoll, which was deposited into Ballon Stoll accounts." *Id.*; Doc. 106-4 ¶¶ 61–62. Thus, drawing all inferences in Cutler's favor, the Court understands him to be asserting, albeit implicitly, that these acts constituted the entirety of his performance obligations.

In his reply, Cutler argues for the first time that the "material compensation terms were agreed orally and confirmed by course of performance." Doc. 119 at 14. Of course, it is axiomatic that a party cannot raise an argument for the first time in a reply brief. But even if the Court overlooked this waiver, Cutler does not explain how the parties' course of performance demonstrates his obligations under the agreement, or that he satisfied them in this case. He merely reiterates, in a conclusory manner, that "[t]he material compensation terms were agreed orally and confirmed by course of performance: the hourly rate, the 26% revenue share, the overtime component, and the 30% share of firm profits." *Id.*

[26] Ballon Stoll also separately argues that, to the extent that Cutler suggested during his deposition that he entered a separate agreement in which Ballon Stoll would purchase his shares upon his departure from the firm, he cannot rely on this theory because it was not alleged in his counter-complaint, and, in any event, the record is devoid of evidence regarding the formation and terms of this alleged agreement. Doc. 98-2 at 15. But because Cutler does not assert this theory in his cross-motion and opposition brief, the Court understands that he does not intend to rely on it for his breach of contract claim. Doc. 106-2 at 12.

provi[sion of] the details thereof . . . suffice[d] to carry [his] burden in resisting summary judgment"); *see also Kramer v. Greene*, 36 N.Y.S.3d 448, 450 (1st Dep't 2016) ("[W]here questions of fact and credibility exist with respect to the existence of a binding oral agreement, and the terms thereof, summary judgment in favor of either side is inappropriate."). That is especially so here, given that Ballon Stoll does not argue that "the agreement cannot be rendered reasonably certain by reference to an extrinsic standard," *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483, or the parties' "expressed words and conduct at the time of the agreement," *Kelly*, 58 N.Y.S.3d at 172. Indeed, Ballon Stoll instead advances a much narrower argument: namely, that Cutler's deposition testimony does not itself render the terms of the agreement sufficiently clear. Given the caution that New York courts have expressed about rejecting contracts as indefinite, the Court therefore declines Ballon Stoll's invitation to dismiss Cutler's contract claim on this basis. *Cobble Hill Nursing Home, Inc.*, 74 N.Y.2d at 483 (explaining that dismissal for indefiniteness should be "at best a last resort").

Separately, Ballon Stoll argues that the contract claim should be dismissed because Cutler has "failed to provide any details or proof to establish that he has in fact incurred any damages" for his contract—or any other—claim. Doc. 98-2 at 15. It bases this contention on Cutler's response to two interrogatories and his deposition testimony, in which he averred that he could not provide a "detailed accounting" or "calculation[]" of his overall damages because he was still reviewing Ballon Stoll and Haroutunian's productions. *Id.*; Doc. 98-20 at 7; Doc. 98-21 at 38. Ballon Stoll seems to argue that, because Cutler did offer a definite calculation of his damages in response to these questions, he cannot show that *any* damages were proximately caused by Ballon Stoll's alleged breach. Doc. 98-2 at 14, 16 (arguing that "Cutler does not allege that he has actually incurred any proximate damages" or "establish[ed] any damages proximately caused by a purported breach").

Ballon Stoll does not, however, cite to any authority that suggests that, to prove that a "defendant's breach resulted in damages," a plaintiff must provide a detailed accounting or calculation of his damages.[27] *34-06 73, LLC*, 39 N.Y.3d at 52. In fact, "[t]o establish liability on a breach of contract claim at summary judgment, a party needs to establish that damages were suffered and not speculative." *Core-Mark Midcontinent, Inc. v. Tri-State Candy Wholesale, Inc.*, No. 14-CV-3694 (SJ) (SJB), 2018 WL 11459108, at *11 (E.D.N.Y. Aug. 31, 2018). "That is, a plaintiff does not need to provide an exact dollar figure for his damages before trial; the plaintiff need show only that he did in fact suffer some damages." *Id.*; *see also Zurich American Life Insurance Co. v. Nagel*, 590 F. Supp. 3d 702, 718 (S.D.N.Y. 2022) ("For purposes of summary judgment, plaintiffs need not . . . prove the exact amount of such damages."). Furthermore, "where the existence of damage is certain, and the only uncertainty is as to its amount, . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer." *Boyce v. Soundview Technology Group, Inc.*, 464 F.3d 376, 391 (2d Cir. 2006) (citation modified). That is because a "person violating his contract should not be permitted entirely to escape liability because the amount of the damages which he has caused is uncertain." *Id.* (quoting *Indu Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 496 (2d Cir. 1995)).

Here, Cutler offers evidence to support his contention that he was damaged by Ballon Stoll's alleged failure to compensate him pursuant to their alleged agreement. In a declaration, he asserts that he was not paid for any of the hours that he worked from April

---

27 Of course, parties *are* required "to provide a 'computation' of each category of damages, and to produce the documents on which that computation is based" pursuant to Rule 26(a). *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 26(a)(1)(A)(iii)). Rule 26(e) also requires parties to supplement these disclosures on a timely basis. *Id.* at 156; Fed. R. Civ. P. 26(e). But Ballon Stoll does not invoke Rule 26 in its motion or argue that Cutler violated its mandate. *See, e.g.*, *id.* at 158–63 (considering the defendants' argument that the plaintiffs should be sanctioned for failing to comply with Rules 26(a) and (e)). It instead argues that because Cutler failed to provide "details" of his estimated damages in his interrogatory responses and deposition, he cannot show that he has satisfied the damages element of his claim. Doc. 98-2 at 14–15; *see also id.* at 16 (arguing that Cutler has not "establish[ed] any damages [that were] proximately caused by a purported breach").

to November 2022, a portion of the referral fees that were due to him from 2021 and 2022, or his 30% cut of firm profits. Doc. 106-4 ¶¶ 54–65. He then offers an estimate of his damages from each of these categories, which includes citations to the record underlying these estimates and an explanation of his calculation method. *Id.* And although Ballon Stoll casts these estimates as "hastily prepared" and "not supported by [the] documents," Doc. 114 at 16, Ballon Stoll does not dispute Cutler's estimates with any greater specificity or explain why any such disputes are so substantial as to negate an inference that Cutler "did in fact suffer some damages." *Core-Mark Midcontinent, Inc.*, 2018 WL 11459108, at *11. Thus, Ballon Stoll's argument that Cutler has entirely failed to offer evidence to support the damages element of his claim is unavailing.

To be sure, Ballon Stoll does also argue that "preclusion of Cutler's purported evidence or calculation of damages is warranted." Doc. 114 at 16. But while it supports this assertion through citing to cases that generally outline four-factor preclusion inquiry, *see, e.g.*, *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 527 (S.D.N.Y. 2018); *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006), Ballon Stoll does not otherwise acknowledge these factors or explain why they warrant preclusion in this case, Doc. 114 at 16–17. "To make a legal argument," however, "is to advance one's contentions by connecting law to facts." *Sioson v. Knights of Columbus*, 303 F.3d 458, 460 (2d Cir. 2002). And in the absence of any attempt to apply the law to the facts of this case, the Court declines to consider Ballon Stoll's preclusion argument for the purposes of this motion.[28] *See Lewis v. Samsung Electronics America, Inc.*, No. 1:22-CV-10882 (JLR), 2023 WL 7623670, at *8 (S.D.N.Y. Nov. 14, 2023) (declining to consider an argument under analogous circumstances). Ballon Stoll's motion for summary judgment on this claim is therefore denied.

[28] The Court also notes that at least some of the evidence on which Cutler relies appears to have been produced by Ballon Stoll and thus was already in its possession.

*ii. Cutler's Motion for Summary Judgment*

Cutler also moves for summary judgment on his contract claim. Doc. 106-2 at 12. Because Cutler bears the burden of proof on this claim, he must show that, based on the undisputed facts, he is entitled to judgment as a matter of law. *Albee Tomato, Inc.*, 155 F.3d at 618. This requires him to undisputably establish each essential element of his claim and thus that no questions of material fact exist for a jury to decide. *Peterson*, 2015 WL 2451227, at *8; *Farrell*, 2004 WL 2813175, at *3.

Here, the existence of an agreement pursuant to which Cutler was entitled to compensation under certain circumstances is not disputed. But because, for the reasons already explained, there are questions of fact as to the material terms that agreement—and whether there was a meeting of the minds as to those terms—summary judgment in favor of either party would be inappropriate. *Kramer*, 36 N.Y.S.3d at 450.

The Court also notes that summary judgment would be inappropriate for at least one other reason. Even if the existence or terms of the agreement were undisputed, there are questions as to whether Ballon Stoll breached at least one term of that alleged agreement. In particular, Cutler claims that, pursuant to this alleged agreement, he was entitled to 30% of the firm's profits and that he was denied this profit share because Haroutunian diverted approximately $2.5 million in immigration revenues from the firm for his personal use. Doc. 106-4 ¶ 64. In other words, Cutler argues that, but for Haroutunian's alleged diversion, these funds would represent firm profits to which he would be entitled to a 30% share. Doc. 106-4 ¶ 60. Haroutunian, however, contends that all immigration revenues that were deposited into his personal accounts were subsequently transferred to Ballon Stoll's accounts or used to pay firm expenses, and that there was no gain to him from the firm's immigration revenues from January 2021 to December 2022. Doc. 114-1 ¶ 63–64; Doc. 114-7 ¶ 18–19. Because there are disputes as to whether these funds were, in fact, diverted from the firm, summary judgment as to this term of the alleged agreement would be inappropriate even if the existence of the

agreement was undisputed.[29] Cutler's motion for summary judgment on his breach of contract claim is therefore denied.

*b. Unjust Enrichment Claim Against Ballon Stoll*

To prove an unjust enrichment claim under New York law, a plaintiff must show that: "(1) the defendant was enriched; (2) at the expense of the plaintiff; and (3) that it would be inequitable to permit the defendant to retain that which is claimed by [the] [p]laintiff." *Valcarcel v. Ahold U.S.A., Inc.*, 577 F. Supp. 3d 268, 283 (S.D.N.Y. 2021). "However, 'unjust enrichment is not a catchall cause of action to be used when others fail.'" *Campbell v. Whole Foods Market Group, Inc.*, 516 F. Supp. 3d 370, 394 (S.D.N.Y. 2021) (quoting *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012)). Rather, "[i]t is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Corsello*, 18 N.Y.3d at 790.

*i. Ballon Stoll's Motion for Summary Judgment*

Ballon Stoll argues that the unjust enrichment claim should be dismissed for two reasons. First, Ballon Stoll contends that Cutler's unjust enrichment claim is duplicative of his contract claim. In general, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery [for unjust enrichment] for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc. v.*

[29] Ballon Stoll and Haroutunian also argue that Cutler has not shown that Haroutunian diverted any funds insofar as he fails to support this assertion with an expert accounting or forensic report. Doc. 114-1 ¶ 64. In response, Cutler argues that "[n]o forensic expert was necessary for [him] to perform that analysis" because his estimate "was based on arithmetic, tracing, and comparison of the records that Haroutunian and Ballon Stoll themselves produced." Doc. 119-1 ¶ 27. The Court questions whether the kind of financial analysis that would be required to determine if corporate funds had been diverted is an issue that falls within a typical lay person's experience and knowledge. *Cf. In re Omnicom Grp., Inc. Sec. Litig.*, No. 02 Civ. 4483 (WHP) (MHD), 2007 WL 2376170, at *12 n.16 (S.D.N.Y. Aug. 10, 2007) ("[I]n a case such as this, which is replete with technical accounting, valuation, and corporate finance issues that are not within a typical lay person's experience and knowledge, such expert reports are essential . . . ."). But the Court need not decide this issue because, in any event, Cutler does not identify the transactions underlying his estimates or assumptions with any specificity. Thus, the Court cannot verify his calculations—or his claim that they are based on simple arithmetic, tracing, and comparison. Doc. 119-1 ¶ 27. As a result, Cutler has not met his burden to indisputably establish that Haroutunian diverted any funds as a matter of law.

*Long Island Rail Road Co.*, 70 N.Y.2d 382, 388 (1987). However, "where there is a bona fide dispute as to the existence of a contract or the application of a contract in the dispute in issue, a plaintiff may proceed upon a theory of [unjust enrichment] as well as breach of contract, and will not be required to elect his or her remedies." *Goldman v. Simon Property Group, Inc.*, 869 N.Y.S.2d 125, 135 (2d Dep't 2008). But "[a]bsent a genuine dispute as to the existence of a contract governing the claims at issue," a parallel unjust enrichment claim "cannot survive" at summary judgment. *Federal Deposit Insurance Corp. v. Murex LLC*, 500 F. Supp. 3d 76, 120–21 (S.D.N.Y. 2020).

Ballon Stoll argues that Cutler's unjust enrichment claim is duplicative of his breach of contract claim because the two claims are premised on the same factual allegations and Cutler does not *himself* dispute the validity of the agreement underlying his breach of contract claim. Doc. 98-2 at 17. Of course, this argument misstates the law insofar as it suggests that, to pursue an unjust enrichment claim in the alternative, a plaintiff must personally challenge the validity of the underlying contract. Instead, a plaintiff may pursue an unjust enrichment claim whenever "there is a dispute over the existence, scope, or enforceability of the putative contract," *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 263 (2d Cir. 1999), regardless of which party raises the dispute, *Ghost in the Machine Inc. v. Planned Parenthood Federation of America, Inc.*, No. 22-CV-9270 (VSB), 2025 WL 252913, at *8 (S.D.N.Y. Jan. 21, 2025). The distinction matters here because, while Cutler does not dispute the validity of the contract he seeks to enforce, Ballon Stoll does. And because, as set forth above, there is a bona fide dispute regarding the existence of a binding agreement and its terms, Cutler may still pursue his unjust enrichment claim in the alternative. *See Palatkevich v. Choupak*, 152 F. Supp. 3d 201, 222 (S.D.N.Y. 2016); *Commercial Lubricants, LLC v. Safety-Kleen Systems, Inc.*, No. 14-CV-7483 (MKB), 2017 WL 3432073, at *22 (E.D.N.Y. Aug. 8, 2017).

Second, Ballon Stoll argues that the unjust enrichment claim should be dismissed because Cutler "has not presented any evidence to establish what[,] if any[,] services or

other things [he] provided to Ballon Stoll for which Ballon Stoll received a[n] unjust benefit" or the value of any such services to Ballon Stoll. Doc. 98-2 at 18. In support of this contention, Ballon Stoll notes that "the measure of damages for an unjust enrichment claim is restricted to the reasonable value of the benefit conferred upon the *defendants*," and that, to prove an unjust enrichment claim, "a plaintiff must present sufficient evidence to measure the *defendant*'s unjust gain." *Pauwels v. Bank of New York Mellon Corp.*, No. 19-CV-2313 (RA), 2025 WL 3063092, at *4 (S.D.N.Y. Oct. 31, 2025) (emphasis added) (first quoting *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 534 (S.D.N.Y. 2011), then quoting *Caro Capital, LLC v. Koch*, 653 F. Supp. 3d 108, 133 (S.D.N.Y. 2023)). That is because, "[i]n the absence of such proof, it is entirely possible that the [plaintiff] was fully compensated for those services, [which] would preclude liability for unjust enrichment." *Balestriere PLLC v. CMA Trading, Inc.*, No. 11 Civ. 9459 (MHD), 2014 WL 929813, at *15 (S.D.N.Y. Mar. 7, 2014) (citing *Giordano v. Thompson*, 564 F.3d 163, 170 (2d Cir. 2009)).

The only response that Cutler offers to this argument is a recitation of the elements of an unjust enrichment claim and the following statement: "Here, Ballon Stoll was enriched at Cutler's expense by withholding significant funds that Cut[l]er should have received and it would be inequitable for allow Ballon Stoll to retain such funds." Doc. 106-2 at 13 (citation omitted). But this conclusory assertion does not engage with the crux of Ballon Stoll's argument—namely, that "Cutler has not presented any evidence or expert report to establish the value *to Ballon Stoll* of . . . services pursuant to which Ballon Stoll was purportedly unjustly enriched." Doc. 98-2 at 18 (emphasis added). Nor does Cutler cite to any aspect of the record that would enable the Court to "ascertain as a matter of law the reasonable value of [his] services" to Ballon Stoll in his discussion of

his unjust enrichment claim.[30] *Balestriere PLLC v. CMA Trading, Inc.*, No. 11 Civ. 9459 (MHD), 2014 WL 929813, at *15 (S.D.N.Y. Mar. 7, 2014); *see also Caro Capital, LLC*, 653 F. Supp. 3d at 135 (granting summary judgment to the counterclaim defendant where the counterclaim plaintiffs "ha[d] not presented any evidence with which a jury could quantify the value they conferred on" the counterclaim defendant); Fed. R. Civ. P. 56(c)(1) (noting that, to survive a summary judgment motion, a plaintiff "must . . . cit[e] to particular parts of materials in the record"). Cutler has therefore waived any argument to the contrary. *See* S*triker Sheet Metal II Corp. v. Harleysville Ins. Co. of New York*, No. 16-CV-05916 (ADS) (AYS), 2018 WL 654445, at *11 (E.D.N.Y. Jan. 31, 2018) ("In the Second Circuit, a party that fails to raise an argument in its opposition papers in a motion for summary judgment has waived that argument."); *Mirvis v. Quay*, No. 19-CV-2573 (LDH) (VMS), 2023 WL 5671935, at *10 (E.D.N.Y. Sept. 1, 2023) (deeming claim abandoned where the plaintiff did not substantively respond to the defendants' legal argument); *Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments. A court need not make the lawyer's case."). The Court thus grants Ballon Stoll's motion for summary judgment on Cutler's unjust enrichment claim and denies Cutler's cross-motion.

---

[30] Although, in support of his breach of contract claim, Cutler cites to his estimates of the damages that he allegedly suffered as a result of Ballon Stoll's breach, these estimates would not appear to support his unjust enrichment claim insofar as they are based on his personal losses under the alleged contract, rather than the reasonable value of Ballon Stoll's gain from his services. *Caro Capital, LLC*, 653 F. Supp. 3d at 133 (explaining that "[t]he appropriate remedy for unjust enrichment is restitution" and that, "[i]n contrast to damages, which are measured by a plaintiff's loss, restitution is measured by a defendant's gain"). The Court also considers it significant that Cutler offers no argument as to why these estimates fall within the "several accepted practices [that courts use] to measure the value of a defendant's unjust gain." *Id.*

*c. Accounting Claim Against Ballon Stoll*

*i. Ballon Stoll's Motion for Summary Judgment*

Ballon Stoll argues that Cutler's accounting claim should be dismissed because, in its view, an accounting claim merely provides a remedy for a plaintiff's substantive causes of action—and is not itself an independent claim for relief. Doc. 98-2 at 21. But, "[u]nder New York law, an accounting *is* a distinct cause of action rooted in equity."[31] *DiTolla v. Doral Dental IPA of New York*, 469 F.3d 271, 275 (2d Cir. 2006) (emphasis added). The cases that Ballon Stoll cites do not suggest otherwise insofar as they apply the substantive law of other jurisdictions. *See Kahn v. Carlebach*, No. 19-CV-3855 (AMD) (JRC), 2023 WL 3792526, at *4 (E.D.N.Y. June 2, 2023) (applying federal copyright law); *Microsoft Corp. v. AGA Solutions, Inc.*, No. 05-CV-5796 (DRH) (MLO), 2007 WL 77775, at *7 (E.D.N.Y. Mar. 12, 2007) (same); *Trafalgar Power, Inc. v. U.S. Bank National Association*, No. 5:05-CV-1533, 2012 WL 555044, *11 (N.D.N.Y. Feb. 21, 2012) (applying Connecticut law). Thus, Ballon Stoll's contention that Cutler's accounting claim should be dismissed because it is purely remedial lacks merit. Because Ballon Stoll offers no other argument for dismissal, its motion for summary judgment with respect to this claim is denied.

*ii. Cutler's Motion for Summary Judgment*

Cutler also cross-moves for summary judgment on his accounting claim. Doc. 106-2 at 13. To prove his accounting claim, Cutler must show: "(1) a fiduciary relationship; (2) entrustment of money or property; (3) no other remedy; and (4) a demand and refusal of an accounting." *Chachkes v. David*, No. 20-CV-2879 (LJL), 2021 WL 101130, at *14 (S.D.N.Y. Jan. 12, 2021) (quoting *Fuller Landau Advisory Services Inc. v. Gerber Finance Inc.*, 333 F. Supp. 3d 307, 315 (S.D.N.Y. Aug. 8, 2018)). Because

[31] An accounting claim seeks "an adjustment of the accounts of the parties and a rendering of a judgment for the balance ascertained to be due." *DiTolla*, 469 F.3d at 275 (quoting 1 Am. Jur. 2d *Accounts and Accounting* § 52 (2006)).

he bears the burden of proof, he must also indisputably establish these elements as a matter of law. *Albee Tomato, Inc.*, 155 F.3d at 618.

Cutler has not shown that he is entitled to summary judgment on this claim for at least three reasons. First, to demonstrate the existence of a fiduciary relationship, Cutler relies on his assertion that he remains a shareholder in the firm. Doc. 106-2 at 13. But given Cutler's admission that he relinquished his shareholder interest along with his resignation, Cutler has not shown that he is still a shareholder and thus maintains a fiduciary relationship with Ballon Stoll on that basis. Second, although Cutler asserts that "no other remedy could fully reveal the extent of the wrongful withholding of funds," he does not elaborate on this assertion or cite to any evidence to support it.[32] 10A *Wright & Miller's Federal Practice & Procedure* § 2721.1 (4th ed. 2026) (explaining that a movant who bears the burden of proof "must lay out the elements of its claim, citing the facts [he] believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing"). Third and finally, although Cutler asserts that his "demands for an accounting were repeatedly refused prior to this litigation," that assertion is disputed. *See* Doc. 106-2 at 13; Doc. 114-1 ¶¶ 14, 52. Thus, Cutler has not met his burden for summary judgment on this claim.

*d. Judicial Dissolution Claim Against Ballon Stoll and Haroutunian*

"Pursuant to New York law, 'the holders of shares representing twenty percent or more' of a corporation may present a petition of dissolution on the grounds that '[t]he directors or those in control of the corporation have been guilty of illegal[,] fraudulent or

---

[32] In fact, "[s]ome courts in this Circuit have dismissed an accounting claim where it is accompanied by a breach of contract (or tort claim) premised on the same facts, on the theory that the plaintiff will be able to obtain the information and damages through discovery of his or her breach of contract claim, and thus, he or she has an adequate remedy at law." *Salameno v. Rawlings*, No. 19 Civ. 4442 (PGG) (BCM), 2021 WL 1085521, at *20 (S.D.N.Y. Mar. 22, 2021) (internal quotations omitted). "Other courts have allowed breach of contract and accounting claims to proceed when pleaded in the alternative, or to the extent that the accounting claim is based on conduct constituting the breach of a duty arising out of the relationship created by the contract but independent of the contract itself." *Id.* at *21 (internal quotations omitted). The Court need not decide this issue, however, because Cutler makes no argument as to the adequacy of his remedy and Ballon Stoll does not urge dismissal on these grounds.

oppressive actions toward the complaining shareholders' or the assets of the corporation 'are being looted, wasted, or diverted for non-corporate purposes by its directors, officers or those in control of the corporation.'" *Mecca v. Lennon*, No. 16-CV-1414, 2017 WL 1410790, at *5 (E.D.N.Y. Apr. 18, 2017) (quoting N.Y. Bus Corp. Law § 1104-a).

Cutler, Ballon Stoll, and Haroutunian all move for summary judgment on this claim. Doc. 98-2 at 21–23; Doc. 106-2 at 13–15. The Court need not address the merits of these arguments, however, because it finds that abstention pursuant to *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943), is appropriate. *See Catlin v. Ambach*, 820 F.2d 588, 591 (2d Cir. 1987) (noting that courts "may raise [an] abstention issue *sua sponte*"); *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) (same). Under *Burford*, a "federal court may abstain from hearing a case or claim over which it has jurisdiction to avoid needless disruption of state efforts to establish coherent policy in an area of comprehensive state regulation." *Friedman v. Revenue Management of New York, Inc.*, 38 F.3d 668, 671 (2d Cir. 1994). The Second Circuit has recognized that judicial dissolution claims "implicate[] *Burford*, given the comprehensive regulation of corporate governance and existence by New York." *Id.* And, "[i]n accordance with that rationale, district courts within this Circuit have routinely, and almost uniformly, elected to exercise *Burford* abstention over claims for the dissolution of a corporation formed under state law." *Busher v. Barry*, No. 14-CV-4322 (NSR), 2019 WL 6895281, at *20 (S.D.N.Y. Dec. 18, 2019) (collecting cases). For the reasons set forth in those cases, the Court finds it appropriate to abstain from consideration of this claim. The Court therefore dismisses Cutler's judicial dissolution claim and denies the relevant cross-motions for summary judgment.

*2. Derivative Claims*

Cutler also asserts derivative claims on behalf of Ballon Stoll and against Haroutunian for breach of fiduciary duty, unjust enrichment, and an accounting. Doc. 51 at 21–22.

*a. Haroutunian's Motion for Summary Judgment*

Haroutunian argues that Cutler cannot assert these claims on behalf of Ballon Stoll because, at the time that he filed his claims, he was no longer a shareholder in the firm. Doc. 98-2 at 20. "In New York, it is well-settled that, in order to have standing, a shareholder seeking to bring a derivative claim on behalf of a corporation must have been a shareholder both at the time of the alleged wrongdoing and at the time the suit is filed." *Hi Bar Capital LLC v. Getter*, No. 22-CV-1743 (ENV) (RML), 2024 WL 1530835, at *3 (E.D.N.Y. Feb. 21, 2024), *report and recommendation adopted in part and rejected in part on other grounds*, No. 22-CV-1743 (ENV) (RML), 2025 WL 2989120 (E.D.N.Y. Oct. 12, 2025). Thus, "[w]here [a] plaintiff voluntarily disposes of [his] stock, his rights as a shareholder cease, and his interest in the [derivative] litigation is terminated." *Independent Investor Protective League v. Time, Inc.*, 50 N.Y.2d 259, 263–64 (1980). This "requirement that ownership continue until commencement of the derivative action . . . is rooted in practical considerations." *Id.* at 263.

By failing to timely respond to Ballon Stoll and Haroutunian's request for admissions, Cutler has admitted that he tendered and relinquished his ownership interest in Ballon Stoll on December 22, 2022. And, for the reasons already explained, the Court has not permitted the withdrawal of these admissions. Because Cutler did not file his derivative claims until July 28, 2023, *see* Doc. 51, he does not have standing to assert these claims on Ballon Stoll's behalf. Haroutunian's motion for summary judgment on the derivative claims is therefore granted.[33] Cutler's cross-motion on these claims is thus denied as moot.

## V. CONCLUSION

For the reasons set forth above, Cutler's motion to withdraw his admissions is DENIED, Cutler and CGW's motion for summary judgment is DENIED, and Ballon

---

[33] Because Cutler's shareholder status provides an independent ground for granting Haroutunian's motion, the Court need not address his remaining arguments for dismissal.

Stoll and Haroutunian's motion for summary judgment is GRANTED in part and DENIED in part. Specifically, Ballon Stoll's motion for summary judgment is granted with respect to its breach of fiduciary duty claim against Cutler and Cutler's unjust enrichment claim against Ballon Stoll. Haroutunian's motion for summary judgment is also granted as to Cutler's derivative claims against him. Ballon Stoll and Haroutunian's motions for summary judgment are otherwise denied with respect to the remaining claims. Cutler's judicial dissolution claim is also dismissed without prejudice on *Burford* abstention grounds.

The parties are further directed to appear for an in-person conference on October 8, 2026, at 11:30 a.m. in Courtroom 619 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007. The Clerk of the Court is respectfully directed to terminate the motions, Docs. 98, 106, and amend the caption to replace "Cutler Gordon and Warga, PLLC" with "CGW Law PLLC."

It is SO ORDERED.

Dated: September 4, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.